**FILED**
CLERK, U.S. DISTRICT COURT

2/4/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2025 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:24-cr-456(A)-VAP |
| Plaintiff, | F I R S T |
| | S U P E R S E D I N G |
| v. | I N D I C T M E N T |
| ANDREW LEFT, | [18 U.S.C. § 1348(1): Securities Fraud; 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5: Fraud in Connection with Purchase and Sale of Securities; 18 U.S.C. § 1001(a)(2): Making False Statements; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| Defendant. | |

The Grand Jury charges:

///

///

///

COUNT ONE

[18 U.S.C. § 1348(1)]

A.    INTRODUCTORY ALLEGATIONS

At times relevant to this First Superseding Indictment:

The Defendant and Relevant Entities

1.    Defendant ANDREW LEFT, then a resident of Beverly Hills, California, was a securities analyst, trader, and frequent guest commentator on business cable news channels such as CNBC, Fox Business, and Bloomberg TV.

2.    Defendant LEFT did business as Citron Research ("Citron"), an online moniker he created as a vehicle for publishing investment recommendations.  Citron's online presence included a website, CitronResearch.com, and an account on the social media platform formerly known as Twitter with the handle @CitronResearch (the "Citron Twitter Account").

3.    In or around October 2018, defendant LEFT formed Citron Capital, LP, a pooled investment vehicle (hedge fund) incorporated in Delaware and registered as an investment adviser in California. Defendant LEFT owned 85 percent of Citron Capital, LLC, which was the general partner of Citron Capital, LP (collectively, "Citron Capital").

4.    Individual A was the minority partner in Citron Capital. Individual A was a securities analyst and trader who conducted research on publicly traded securities and executed trades at the direction of defendant LEFT.

5.    Using Citron's online platform, defendant LEFT disseminated commentary about publicly traded companies in which he asserted that the market incorrectly valued a company's stock (the "Targeted

Security"), advocating that the current price was too high or too low. Defendant LEFT's recommendations often included an explicit or implicit representation about Citron's trading position and a "target price," which defendant LEFT represented as his own view of the Targeted Security's true value.

6. Defendant LEFT published his recommendations in Citron-branded reports, articles, and social media content and promoted them through media campaigns, including outreach to members of the news media, appearances on cable news programs, and interviews published in news articles online. In connection with his media appearances and interviews, defendant LEFT was routinely required to disclose the positions that he and Citron held in a Targeted Security.

7. Defendant LEFT knew that his recommendations influenced investors' decisions to buy or sell stock and thereby empowered him to manipulate the price of a Targeted Security. By using the Citron Twitter Account to generate "catalysts" -- events with the ability to move stock prices -- defendant LEFT profited from his advance knowledge that he was about to trigger such movements in the market. But for the scheme to work, defendant LEFT knew that investors needed to believe that the recommendations and positions he set forth were sincerely maintained, and not merely vehicles for defendant LEFT to personally profit. To maintain the false pretense that Citron's recommendations and positions were sincerely held, defendant LEFT made false and misleading representations and half-truths about his economic incentives, conviction in Citron's analyses, and valuations of Targeted Securities. Because disclosing the truth would diminish his credibility, defendant LEFT made false and misleading statements and half-truths to deceive investors to believe that he held a

3

position when, in fact, after using his influence on the market to manipulate stock prices in a particular direction, defendant LEFT closed his positions to capitalize on the temporary price movement caused by his public statements.  Defendant LEFT used this deception and concealment to manipulate the market for his own financial gain.

<u>Stock Trading</u>

8.    An investor held a "long" position in the stock of a publicly traded company if the investor stood to gain financially from an increase in the price of that company's shares.  For example, the investor could own the security with the expectation that the shares would rise in price in the future.  An investor could also have a "long" position by buying "call" options that entitled the option-holder to purchase shares at a future date at a prearranged price (referred to as the "strike price") that the investor believed would be lower than the market price the security would have reached by that date.

9.    An investor held a "short" position in the stock of a publicly traded company if the investor stood to gain financially from a decrease in the price of that company's shares.  An investor could achieve a short position in various ways, including "short selling" shares of the company's stock or through the purchase of "put options."

a.    Short selling involved borrowing shares of a company's stock from a broker for a fee and then selling the borrowed shares. If the price of the shares decreased, the short seller could then return the borrowed shares to the broker by purchasing them at a lower price on the open market than the short seller originally sold them, thereby capturing the decline in the stock's price as a profit.

b.   When buying put options, the option-holder could force the counterparty to buy shares of a particular stock at a future date at a prearranged price.  If the price of the shares decreased by that future date, the option-holder could sell the counterparty those shares at a higher price than the option-holder could acquire them for on the open market, thereby profiting from the fall in the stock's price.

10.  "Short-dated options" expired and became worthless after a set duration, which could be as soon as the same day they are purchased.  Buying short-dated options could reflect a trader's bet that the price of the underlying security would move in a short timeframe before the contract expires.

11.  An investor could open or close trading positions by placing "limit" orders or "market" orders.  A limit order was an order to buy or sell a security if its price was available above or below a certain price, whereas a market order was an order to buy or sell at whatever price the security was then trading.  Placing a limit order could indicate the price at which a trader intended to buy or sell a security in the future.

12.  A "retail investor" was a non-professional, individual investor who purchased securities for their own personal accounts and generally traded and invested in dramatically smaller amounts and volumes as compared to institutional investors (i.e. mutual funds, hedge funds, or professional traders).

13.  Interactive Brokers LLC ("IB") and E*TRADE Securities Inc. ("E*TRADE") were online brokerage platforms that enabled individuals and institutions to trade stock shares, options, and other securities and financial instruments.  Defendant LEFT held accounts in his name

5

and in Citron Capital's name at IB (the "Citron IB Account") and at E*TRADE (the "LEFT E*TRADE Account") (collectively, the "LEFT Trading Accounts").

14.  The New York Stock Exchange ("NYSE") and the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ") were "national securities exchanges" within the meaning of the Securities Exchange Act of 1934.

15.  The common stock and options to trade the common stock of American Airlines Group Inc. ("AAL"); Beyond Meat Inc. ("BYND"); Chegg, Inc ("CHGG"); Cronos Group Inc. ("CRON");Facebook Inc. ("FB"); Fleetcor Technologies, Inc. ("FLT") n/k/a Corpay;  General Electric Company ("GE"); Grand Canyon Education, Inc. ("LOPE"); Luckin Coffee Inc. ("LK"); McKesson Corporation ("MCK"); Namaste Technologies Inc. ("NXTTF"); Novavax Inc. ("NVAX"); Nvidia Corp. ("NVDA"); India Globalization Capital Inc. ("IGC"); Invitae Corp. ("NVTA"); Palantir Technologies Inc. ("PLTR"); PolarityTE Inc. ("PTE"); Roku Inc. ("ROKU"); Tesla Inc. ("TSLA") Twitter Inc. ("TWTR"); and XL Fleet Corp. ("XL") were securities.  AAL, BYND, CRON, CHGG, FB, FLT, GE, LK, LOPE, MCK, NVAX, NVDA, IGC, NVTA, PLTR, PTE, ROKU, TSLA, TWTR, and XL were issuers with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*) and that were required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)).

<u>The Investigation into Illegal Market Manipulation</u>

16.  The Federal Bureau of Investigation ("FBI"), the United States Postal Inspection Service ("USPIS"), the United States Attorney's Office for the Central District of California ("USAO"), and the Fraud Section of the United States Department of Justice

("DOJ") were conducting a federal criminal investigation of defendant LEFT for federal crimes, including illegal market manipulation in violation of the federal securities laws (the "Federal Investigation").

17.    The United States Securities and Exchange Commission ("SEC") was an agency of the United States conducting a civil investigation of defendant LEFT for violations of the federal securities laws (the "SEC Investigation").

B.    THE SCHEME TO DEFRAUD

18.    Beginning no later than in or about March 2018, and continuing through at least in or about October 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant LEFT, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud investors and potential investors in connection with securities of issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that were required to file reports under section 15(d) of the Securities Exchange Act of 1934, in violation of Title 18, United States Code, Section 1348(1).

C.    THE OPERATION OF THE SCHEME

19.    The scheme to defraud operated, in substance, as follows:

a.    Knowing that Citron's reputation with investors had the power to move markets, defendant LEFT selected a Targeted Security about which he intended to publish commentary with the intention of manipulating the Targeted Security's price.

b.    Defendant LEFT prepared commentary about the Targeted Security for dissemination through Citron. In some instances, the commentary represented defendant LEFT's own work. In other

7

instances, defendant LEFT disseminated as his own the commentary of third parties, such as analysts at hedge funds.

c.   In the leadup to publication of Citron's commentary, defendant LEFT established long or short positions in a Targeted Security in one or both of his accounts, the LEFT Trading Accounts, such that defendant LEFT profited by taking advantage of the intended short-term movement in the Targeted Security's price caused by his commentary.

d.   To exploit his advance knowledge of the timing and subject of the forthcoming commentary on the Targeted Security, defendant LEFT often built his positions using inexpensive, short-dated options contracts that would expire within zero to five trading days and submitted limit orders to close his positions as soon as the Targeted Security reached a certain price.

e.   To maximize the impact of Citron's commentary on the price of the Targeted Security, and thus defendant LEFT's ability to profit from his advance knowledge that a price movement was about to be triggered, defendant LEFT caused Citron's commentary to be deceptive in numerous respects, including the following:

i.   Knowing that Citron's influence on the market was largely based on his personal reputation, defendant LEFT concealed the contributions of third parties, including hedge funds, in the preparation of Citron's commentary.  Defendant LEFT also maintained the false pretense that the content of the Citron's commentary was not tainted by any conflict of interest by concealing that he often provided these and other third parties, including in return for compensation, advance notice of the anticipated publication of Citron Reports to enable the third parties to profit by trading around the

8

Citron Reports and/or mitigate their losses by adjusting their positions.

      ii.  Knowing that Citron's influence on the market was also based in large part on the public's perception that he was confident in the content and conclusions of Citron's commentary, defendant LEFT concealed his intention to trade a Targeted Security in a manner inconsistent with the content and conclusions of Citron's commentary by covering all or the majority of the positions he held in the Targeted Security shortly after the Citron commentary on the Targeted Security was published.

      iii. To maximize the impact of Citron's commentary on the price of a Targeted Security, defendant LEFT bolstered Citron's credibility through false and misleading statements about its research staff, process, independence, external investors, and economic incentives.

      iv.  To enhance the perception that he was confident in the Citron commentary's conclusions and create the perception that his analyses were rigorous, defendant LEFT often included a "target price" for a Targeted Security which was purportedly derived from his analyses and reflected his sincere projection of the Targeted Security's future price. In reality -- with the hope of triggering not a pistol shot but a cannon blast -- defendant LEFT selected extreme target prices to attract media attention and provoke an immediate change to the prices of the Targeted Security while concealing his intention to exit all or the majority of the positions he held in the Targeted Security well before they reached -- if they ever did -- the target price selected.

1          v.    To draw the attention of news-based trading

2   algorithms and to alarm investors, defendant LEFT included

3   sensationalized headlines and inflammatory language in the Citron

4   reports, such as "fraud" and "smoking gun."   In employing this

5   rhetoric, defendant LEFT generally sought to maximize the impact on

6   the price of the Targeted Security as quickly as possible and create

7   the opportunity for defendant LEFT to profitably exit his position as

8   quickly as possible.

9          f.    Knowing that Citron's influence on the market was

10  largely based on the public's perception that he was confident in the

11  content and conclusions in Citron's commentary, defendant LEFT made

12  false and misleading representations about his and Citron's trading

13  and concealed the fact that he intended to and did trade in a manner

14  designed to exploit the temporary price volatility that Citron's

15  commentary created.   To profit from the intended price movement

16  triggered by Citron's reports and tweets, defendant LEFT covered all

17  or substantially all of the positions he held in a Targeted Security,

18  often within hours -- and sometimes minutes -- after publication.

19         g.    To buttress the public perception that defendant LEFT

20  was committed to the views expressed in Citron's commentary,

21  regardless of the immediate impact on the price of a Targeted

22  Security, defendant LEFT engaged in media campaigns, appearing in

23  podcast and television interviews and in print and online media, to

24  promote his investment commentary, often including false and

25  misleading statements.   These campaigns had the intended effect of

26  amplifying defendant LEFT's ability to manipulate the price of the

27  Target Securities.

28

h.    To create the false impression that he managed outside investors' money, in order to bolster his influence with the investing public and ability to artificially move securities prices, defendant LEFT made false and misleading statements –– including publicly issuing "investor letters" –– to advance the false pretense that he successfully managed third-party investors' funds and was a credible investment adviser.  In fact, Citron Capital never had outside investors.

i.    Knowing that Citron's influence on the market was largely based on defendant LEFT's personal reputation and market-moving capacity, defendant LEFT also falsely represented that he did not share Citron's commentary with hedge funds before the reports were published.  In truth, defendant LEFT often provided third parties, including hedge funds, with advance notice of the anticipated publication of Citron's commentary to enable the third parties to profit by trading around the commentary and, in other instances, mitigate their losses by adjusting their positions before publication.  For example:

i.    Defendant LEFT coordinated with hedge funds to disseminate short reports and information to be posted on Twitter, coordinated with hedge funds regarding the timing of publication, and enabled the hedge funds to trade in the Targeted Securities before the reports were disseminated.  In exchange for sharing his planned announcements with the hedge funds in advance of posting them publicly, the hedge funds paid defendant LEFT a portion of their trading profits.

ii.    To maintain the illusion of Citron's independence, and thus the credibility of Citron's commentary,

1  defendant LEFT concealed Citron's financial relationships with hedge

2  funds, and falsely represented to law enforcement that Citron "never"

3  exchanged compensation with a hedge fund or coordinated trading with

4  a hedge fund in advance of the issuance of its commentary.

5            iii. Defendant LEFT submitted false invoices for

6  consulting services to a third party despite not providing any

7  consulting services, and the third party transferred payments from

8  Hedge Fund A to defendant LEFT.  In truth, the payments were

9  defendant LEFT's share of profits from Hedge Fund A's trading around

10  Citron's publications and media campaigns.

11     20.  To maintain his scheme to manipulate the market and prevent

12  his deceptive practices from being discovered, defendant LEFT:

13            a.    Communicated using encrypted messaging apps;

14            b.    Deleted electronic communications even when directed

15  by the SEC to maintain those communications for use in its

16  investigation into defendant LEFT and Citron's practices; and

17            c.    Made false statements when interviewed by federal law

18  enforcement in connection with the Federal Investigation.

19                Defendant LEFT's Use of Deceptive Reports

20                    Cronos Group Inc. (CRON)

21     21.  On or about August 27 and August 28, 2018, in electronic

22  communications, defendant LEFT wrote Individual B, a portfolio

23  manager for Hedge Fund A: "I have a hot voice in cannibas[;] Let's

24  take a vantage of it"[;] and "what stock is alll retail . . .  the

25  best shorts are retail shorts no doubt[;] we can make money in weed

26  [;] i have good weed track record . . .  do we go long [other

27  company] or short CRON . . .   we can DESTROY CRON," and "cron short

28  we could get 2 bucks."

22.  At the open of the market on the morning of on or about August 29, 2018, defendant LEFT had no position in CRON.  At approximately 9:41 a.m., defendant LEFT began building a short position in CRON.  Prior to 10:07 a.m. on or about August 30, 2018, defendant LEFT had built a short position of approximately 943,900 shares of short exposure to CRON (including a short equity position, put options purchased, and call options sold).

23.  On or about August 30, 2018, at approximately 10:07 a.m., defendant LEFT posted on the Citron Twitter Account, including a link to a Citron short report with the headline, "CRON: The Dark Side of The Cannabis Space" and a tweet stating "$CRON tgt price $3.5. Everything that is contaminated about the Cannabis space.  ALL HYPE with possible securities fraud . . . ."  At the time of the tweet, CRON was trading at approximately $11.50 per share.

24.  On or about August 30, 2018, at approximately 11:08 a.m., defendant LEFT posted again on the Citron Twitter Account, promoting his short position on CRON, that, "Andrew Left from Citron on CNBC Fast Money 5:25pm ET to discuss why $CRON is the most overhyped of all the 'pot stocks' with a target price of $3.5[.]"

25.  Defendant LEFT placed orders to begin closing out his short CRON position approximately 24 minutes after posting the first tweet. By the close of the trading day, defendant LEFT had a net short exposure of approximately 348,900 shares -- a reduction of approximately 61 percent of defendant LEFT's total pre-CRON tweet position.

26.  Later on August 30, 2018, after the close of market, defendant LEFT appeared on CNBC's "Fast Money" and defended his characterization of CRON as a fraud. During the telecast, defendant

13

LEFT was directly asked -- twice -- about his own position in CRON.
The host followed up and asked, "Are you just as short the stock
right now as you were at the beginning of the day?" Defendant LEFT
falsely stated that he only covered a "small size" of his short
position in CRON earlier that day when, as defendant LEFT then knew,
at the time of his appearance on CNBC, he had already closed more
than 60 percent of his pre-tweet positions.

27.  On or about August 31, 2018, in an electronic communication
to Individual B, defendant LEFT wrote that once he realized that it
was retail investors who owned CRON stock, his trades around Citron's
commentary were like taking "candy from a baby."

28.  On or about October 4, 2023, and October 5, 2023, in an
effort to conceal his market manipulation scheme, defendant LEFT
falsely represented in testimony given under oath before the SEC that
he did not target stocks that had large retail bases.

PolarityTE Inc. ("PTE")

29.  On or about October 9, 2018, defendant LEFT began
substantially increasing his short position in PTE in the LEFT
Trading Accounts.

30.  As he built his short position, defendant LEFT purchased at
least one option contract that expired on October 19, 2018.

31.  On October 18, 2018 at approximately 8:00 a.m., defendant
LEFT placed a limit order to sell his option contracts at a price
approximately equivalent to the equity price of $10.50.

32.  On October 18, 2018, at approximately 10:09 a.m., defendant
LEFT posted on the Citron Twitter Account, announcing a $2 target
price for PTE and including a link to a Citron short report regarding
PTE.  The tweet stated: "FDA just opened of the kimono of$PTE [sic]

and OMG.  In our shortest but most damning report of the year.  We let the FDA do the talking as we present the one document Polarity tried to hide from investors Tgt- $2 [Citron Research link]."  In the report, defendant Left stated: "And we believe the stock is a ZERO."

33.  At the time of publication of the tweet and report, defendant LEFT had a net short position of approximately 197,671 shares.  Shortly after his tweet, a preexisting order for additional put options was executed, increasing his net short exposure by an additional 50,000 shares.

34.  Approximately nineteen minutes after posting the tweet, defendant LEFT began closing his short position.  Within two hours of the tweet and report, defendant LEFT closed approximately 69 percent of his short position in PTE.

35.  Within two trading days, by on or about October 22, 2018, defendant LEFT had completely closed his short position in PTE, for a profit of approximately $345,000.

### Tesla, Inc. (TSLA)

36.  On or about October 22, 2018, in the LEFT E*TRADE Account, defendant LEFT purchased short-dated call options, representing more than approximately 235,000 shares of exposure to TSLA stock, that expired on or about October 26, 2018.  Defendant LEFT also purchased TSLA shares on or about October 22 and 23, 2018.

37.  Or about October 23, 2018, defendant LEFT posted the following on the Citron Twitter Account to promote his long position on TSLA: "$TSLA dropping earnings on top of $F tomorrow might be a bad sign for shorts.  After reviewing all recent info on $TSLA dominating its categories, Citron is LONG Telsa for this quarter."

1  Defendant LEFT also included a link to a Citron report on TSLA.  At

2  the time, TSLA's stock was trading at approximately $266.

3      38.  Within one minute of announcing, "Citron is LONG Tesla for

4  the quarter," defendant LEFT placed an order to sell call options,

5  and within thirty minutes, the order was executed, for a profit of

6  approximately $1 million.  By the close of the next trading day, on

7  or about October 24, 2018, defendant LEFT sold approximately 81

8  percent of his pre-tweet position for a profit of approximately $6.6

9  million.  This trading all occurred prior to TSLA's earnings

10  announcement on or about October 24, 2018.

11     39.  Expecting that Citron's commentary on TSLA would invite

12  others to question Citron's integrity and to advance the false

13  pretense that defendant LEFT did not opportunistically trade around

14  Citron's reports, defendant LEFT stated in the report:

15         We know this note is going to have many critics, most being
            our fellow short sellers who might categorize us as
16         opportunist. To anyone who challenges the integrity of
            Citron or our constant monitoring of the Tesla story all
17         you have to do is look at the class action lawsuit recently
            filed against Tesla.  In it you will see the principal of
18         Citron was actively trading tens of millions of dollars of
            Tesla and the infamous "$420" tweet resulted in a loss of
19         almost $2 million.  By no means does Citron only trade on
            publishing stories.  We actively manage a book that has
20         been trading Tesla for five years.

21     40.  On or about October 23, 2018, defendant LEFT appeared on

22  CNBC to promote Citron's long report on TSLA.

23                        Nvidia Corp. (NVDA)

24     41.  On or about November 20, 2018, at approximately 8:40 a.m.,

25  in an electronic communication with Individual C, a portfolio

26  manager, defendant LEFT wrote: "Do you want to make some fast

27  money[.]  Put together a thesis why nvda is oversold . . . We can

28

                                16

destroy it . . . Just read the analyst notes from this past quarter and assemble the best of the ideas."

42. Later that morning, between approximately 9:40 a.m. and 10:17 a.m., defendant LEFT, through the LEFT Trading Accounts, opened additional long positions in NVDA, including short-dated call options that expired three days later.

43. At approximately 10:17 a.m., defendant LEFT promoted NVDA as a favorable investment on the Citron Twitter Account, stating, "Citron buys $NVDA. This is the first time in 2 years stock offers an appealing risk-reward to investors . . . We see $165 before we see $120." At the time, NVDA's stock was trading at approximately $144.

44. Despite his representation that he expected NVDA's share price to rise to $165, less than two hours after announcing "Citron buys $NVDA," prior to 12:00 p.m., defendant LEFT sold 100 percent of his pre-tweet positions in the LEFT Trading Accounts when the NVDA was trading within a range of approximately $150 to $153, for a profit of at least $930,000.

<u>Twitter, Inc. (TWTR)</u>

45. On or about December 20, 2018, defendant LEFT held approximately 145,000 share short equity position in TWTR stock in the LEFT Trading Accounts. In the Citron IB Account, defendant LEFT bought short-dated put options, representing more than 1.2 million shares of TWTR stock, that expired on December 21, 2018.

46. Prior to publishing a tweet concerning TWTR, at approximately 9:41 and 9:43 a.m., defendant LEFT entered limit orders to sell his put options in the Citron IB Account.

47. At approximately 9:52 a.m., defendant LEFT posted on the Citron Twitter Account with a link to a Citron report about TWTR:

17

1  "$TWTR has become Harvey Weinstein of social media.  Price tgt $20

2  Amnesty Intl study cannot be ignored by Wall St or Madison Ave.

3  $TWTR will be forced to clean up the site and will have a fast impact

4  on MAU[.]".  At the time of the tweet, TWTR's stock was trading at

5  approximately $31.

6      48.  Within one trading day, defendant LEFT closed 100 percent

7  of his short positions in TWTR in the LEFT Trading Accounts when TWTR

8  was trading within a range of approximately $27 to $31 for a profit

9  of at least $2 million.

10     49.  On or about December 20, 2018, in private electronic

11  communications, defendant LEFT and Individual A had the following

12  conversation about their trading around Citron's tweet and report on

13  TWTR:

14         Defendant LEFT:        I feel like I want blood
                                  Made some money back today on
15                                the short side

16         Individual A:          $2m trade Twtr

17         Defendant LEFT:        Gives power for long

18         Individual A:          Not bad

19         Defendant LEFT:        Whew
20                                If we bounce

21         Individual A:          Huge fucking day

22         Defendant LEFT:        Every news outlet is calling me

23         Individual A:          Love the title. Harvey Weinstein of
24                                social media
25                                Love twtr bounce

26         Defendant LEFT:        We will get another shot at it

27

28

                                    18

50.   During the same conversation, defendant LEFT and Individual A discussed being "a tweet away" from meeting Citron's end of year target of $21 million.

## Facebook, Inc. (FB)

51.   On or about December 26, 2018, in the morning, defendant LEFT opened a long position in FB in the LEFT Trading Accounts, including approximately 20,000 shares of stock and short-dated call options representing approximately 350,000 shares of FB stock that expired in two days on December 28, 2018.

52.   On or about December 26, 2018, at approximately 9:52 a.m., defendant LEFT posted on the Citron Twitter Account, with a link to a Citron report on FB: "$FB Backing up the sleigh. $160 tgt. Citron presents the only information that counts on $FB looking past the rhetoric. Would you rather have your kids addicted to Nicotine or Instagram? Wall St answer will amaze you[.]" At the time of the tweet, FB's stock was trading at approximately $129.

53.   To cause a temporary and artificial increase in the stock price of FB by which he could profit, defendant LEFT publicly stated in the Citron report that FB was Citron's "2019 S&P Stock of the Year."

54.   On or about December 26, 2018, in a private electronic communication, defendant LEFT explained his strategy to artificially manipulate the price of FB stock: "As crazy as it sounds when I put out reports and big names like this in the middle of the day what I'm really doing is switching algorithms" and "sometimes it works in a big way."

55.   Within six hours of posting Citron's tweet and report promoting his long position in FB, defendant LEFT sold the equivalent

19

of approximately 320,000 shares, approximately 89 percent of his pre-tweet position in the LEFT Trading Accounts, at a time when FB was trading within a range of approximately $126 to $134.  Within 48 hours, defendant LEFT sold 100 percent of his pre-tweet long positions in FB for a profit of at least $680,000.

<u>Defendant LEFT's Use of Deceptive Tweets</u>

<u>Roku, Inc. (ROKU)</u>

56.  On or about January 8, 2019, prior to approximately 9:40 a.m., defendant LEFT opened short positions in ROKU including short-dated put options that expired within three trading days (on January 11, 2019) in the LEFT Trading Accounts.

57.  At approximately 9:41 a.m., defendant LEFT posted to the Citron Twitter Account that ROKU was "uninvestable."  At the time, ROKU's stock was trading at approximately $41.  Within two minutes of posting the tweet, defendant LEFT placed orders to exit his pre-tweet positions. In the Citron IB Account, defendant LEFT placed a limit order to exit his short equity position at $40.87, and by approximately 11:03 a.m. -- approximately one hour and twenty-two minutes after the tweet -- defendant LEFT exited his entire pre-tweet positions in the LEFT Trading Accounts.

58.  On or about January 8, 2019, at approximately 12:58 p.m., in an electronic communication, a ROKU investor told defendant LEFT, "One of these days you'll see the light on Roku."  In response, defendant LEFT stated: "Lol.  Was a great set up for Trade this morning."

59.  By on or about January 8, 2019, at approximately 1:20 p.m., defendant LEFT deleted the earlier tweet on ROKU from the Citron Twitter Account and falsely and misleadingly posted: "To clarify, we

are watching ROKU from the side," when, in fact, defendant LEFT made
at least $700,000 in profits from his manipulative statement and
trading in ROKU that morning.

<u>Beyond Meat (BYND)</u>

60.    On or about May 17, 2019, defendant LEFT began to
substantially increase his short position in BYND in the LEFT Trading
Accounts.    Just prior to approximately 1:50 p.m. -- when Citron
published a tweet on BYND -- defendant LEFT held a net short exposure
of approximately 496,000 shares of BYND.    Included in defendant
LEFT's position were put options with a strike price of $90 that he
purchased on or about May 17, 2019, which expired that same day. Just
prior to the publication of Citron's tweet, BYND was trading at
approximately $86.

61.    At approximately 1:50 p.m., defendant LEFT tweeted on the
Citron Twitter Account: "$BYND has become Beyond Stupid. Most heavily
traded retail stock on Robinhood, market cap now bigger than
industry, and superior competitor coming to market soon. We expect
$BYND to go back to $65 on earnings On retail exhaustion. [Look]"

62.    Within approximately three minutes of the tweet, defendant
LEFT began closing his position in the Citron IB Account in BYND.
Between approximately 1:52 and 2:02 p.m., within twelve minutes of
posting the tweet, defendant LEFT sold the $90 put options that
expired the same day.    At approximately 2:03 p.m., defendant LEFT had
reduced his net short exposure (in options and equities) in the LEFT
Trading Accounts to approximately 6,500 shares -- a reduction of
approximately 98 percent in his position.

63.    At approximately 2:08 p.m., defendant LEFT responded to an
inquiry from CNBC concerning his position.    Defendant LEFT wrote back

to CNBC: "Yes I shorted some today Seems to be all retail driven
without any fundamental basis."  Defendant LEFT's statement was
materially misleading because he had covered nearly his entire short
position by this time.

64.  Defendant LEFT purchased additional $90 put options (also
expiring that day) upon learning that CNBC would be publishing an
article concerning BYND.  By approximately 9:41 a.m. the next
morning, on or about May 20, 2019, defendant LEFT had completely
closed his entire position in BYND despite the price remaining above
approximately $84 per share -- substantially above the $65 target
price included in Citron's tweet.

Luckin Coffee Inc. ("LK")

65.  On or about January 31, 2020, at approximately 10:40 a.m.,
defendant LEFT established a net short position in LK in the LEFT
Trading Accounts.

66.  Approximately an hour later, defendant LEFT switched
directions and began establishing a net long position in LK in the
LEFT Trading Accounts, purchasing approximately 585,000 shares,
including option contracts that expired the same day.

67.  At approximately 12:51 p.m., defendant LEFT posted on the
Citron Twitter Account: "Citron long $LK.  We also rec. this report
but all data from Biz Con China and App download and calls with
competitors confirm financials.  $LK biz is on fire in China.  Citron
has respect for Muddy, but this anon. report will fall short on
accuracy.  Expect LK management response."

68.  Within one minute of this tweet's publication, defendant
LEFT began closing his long position in LK; by the end of the day, he
had closed approximately 74 percent of his long position.

69.  By February 3, 2020, at approximately 10:09 a.m., the next trading day, defendant LEFT had closed his entire LK long position, for a profit of approximately $1.076 million.

<u>Novavax Inc. ("NVAX")</u>

70.  On or about April 20, 2020, at approximately 12:28 p.m., defendant LEFT opened a short position in NVAX in the LEFT Trading Accounts, including option contracts that expired in four days, on April 24, 2020.

71.  The same day, April 20, 2020, at approximately 1:16 p.m., defendant LEFT placed a limit order to sell his option contracts at a price that was approximately equivalent to $19 per share.

72.  The same day, April 20, 2020, at approximately 1:22 p.m., defendant LEFT posted to the Citron Twitter Account regarding NVAX: "As much as Citron wants a vaccine $NVAX is a serial promise and non deliver on every virus.  Insiders sold most holding 85% lower last year.  Bal sheet upside down and $$ is needed for NanoFlu.  Expect secondary soon and stock back to $15.  Retail mania!!"

73.  At the time of this tweet's publication, defendant LEFT had a net short position of approximately 315,695 shares in NVAX exposure.

74.  Approximately one minute after publication, defendant LEFT began closing his short position, and within approximately one hour of the tweet, defendant LEFT had closed approximately 94 percent of his short position in NVAX.

75.  By approximately 10:33 a.m. the next day, April 21, 2020, defendant LEFT had completely closed his NVAX position for a profit of approximately $430,000.

<u>American Airlines (AAL)</u>

23

76.  On or about June 5, 2020, defendant LEFT opened short positions in AAL in the LEFT Trading Accounts that would generate a profit if AAL's stock price declined.  In addition to his equity short positions, between approximately 11:47 a.m. and 11:53 a.m., defendant LEFT purchased short-dated $19 and $20 put options, in the Left Trading Accounts, that expired the same day.  At the time of the trades, AAL was trading at approximately $20.

77.  At approximately 11:54 a.m., defendant LEFT posted on the Citron Twitter Account: "$AAL Back to $10 Robinhood traders have 0 idea what they [sic] buying.  Balance sheet is upside down.  Unencumbered assets worth far less than current price.  The reason why Buffett fully exited lower.  They don't teach finance in the Sherwood Forest."

78.  Within ten minutes of posting the tweet announcing a target price of $10, defendant LEFT exited his short-dated options positions and placed limit orders to close his short equity positions in the LEFT Trading Accounts at prices ranging from approximately $18 to $19.50.

79.  At approximately 12:08 p.m., defendant LEFT posted a second tweet on the Citron Twitter Account: "$AAL.  To clarify previous tweet the 25k new users on Robin Hood who bough [sic] stock at $19 must know more about airlines than Buffet who sold the stock at $11.  Send your resumes to Omaha.  Expect stock to trade back to $10."

80.  By approximately 12:37 p.m., defendant LEFT completely closed his pre-tweet trades in the LEFT Trading Accounts for a profit of approximately $340,000.

## Palantir (PLTR)

81.  Despite having held a long position in PLTR earlier that day, on or about November 24, 2020, defendant LEFT opened short positions in PLTR in the LEFT Trading Accounts that would generate a profit if PLTR's stock price declined.  In addition to his equity short positions, on or about November 27, 2020, defendant LEFT purchased, through the Citron IB Account, short-dated put options that expired the same day.

82.  On or about November 27, 2020, at approximately 10:08 a.m., defendant LEFT posted on the Citron Twitter Account: "What a run the past month for all.  But as traders looking for short exposure, $PLTR is no longer a stock but a full casino.  Does not take a ball of crystal to know this will fall back to Arda [sic].  Shorting with a $20 2020 target."  At the time, PLTR's stock was trading at approximately $31.

83.  Approximately eight minutes after calling PLTR a "casino" stock and stating that Citron was "shorting with a $20 2020 target," defendant LEFT began closing his short positions in the Citron IB Account.  By market close, defendant LEFT completely closed the equity positions that he opened in the Citron IB Account immediately prior to posting the tweet.  At market close on or about November 27, 2020, PLTR was trading at approximately $28.

84.  The next trading day, on or about November 30, 2020, by approximately 10:54 a.m., defendant LEFT completely closed his short positions in the LEFT Trading Accounts for a profit of approximately $800,000.

<u>XL Fleet Corp. (XL)</u>

85.  On or about December 23, 2020, between approximately 11:10 a.m. and 1:40 p.m., defendant LEFT made net purchases of

25

approximately 345,000 shares of XL stock in the LEFT Trading Accounts
to establish a long position of 445,000 shares.

86.  At 1:37 p.m., approximately four minutes before posting a
tweet promoting his long position in XL, defendant LEFT placed a
limit order to sell his shares in the LEFT E*TRADE Account if XL rose
in price to $27.50 per share.  XL was trading at approximately $25
per share at this time.

87.  At approximately 1:41 p.m., defendant LEFT posted to the
Citron Twitter Account: "Citron long $XL tgt $60."  Approximately one
minute later, defendant LEFT placed a limit order to sell his shares
in the Citron IB Account if XL rose in price to $28.

88.  Within one trading day, defendant LEFT sold all of the XL
shares he purchased on or about December 23, 2020, in the LEFT
Trading Accounts for a profit of approximately $2.7 million.

Additional False and Misleading Statements and Securities Trading in
Furtherance of the Scheme

89.  In furtherance of the scheme to defraud, defendant LEFT
posted false and misleading statements on the Citron Twitter Account
and website concerning the following securities: CHGG, FLT, MCK, and
LOPE.

90.  On or about the following dates, defendant LEFT
disseminated the following tweets and links to Citron reports via the
Citron Twitter Account in furtherance of the fraudulent scheme:

| 3/22/2019 | $CHGG is the poster child for institutionalized academic cheating.  Tgt $25 Cannot be disputed, cheating now matters $CHGG activities illegal in 17 states. If Chegg turns over the customer list, the stock could be a 0. [Citron Research link] |
|---|---|

| 6/6/2019 | $FLT Citron exposes one of the largest Clean Energy Frauds in the history of the United States.  $FLT has fraudulently sold well over $100 mil in phony carbon offsets.  Aggressive has turned illegal. There is no way this avoids enforcement |
| 9/27/2019 | $MCK as a public nuisance.  The whole story has changed.  Citron is proud to present to changing status of the opioid lawsuit and why $MCK will trade down to $80 [Citron Research link] |
| 1/28/2020 | $LOPE - the Enron of Education? We present detailed evidence through a 870 page FOIA request that $LOPE is illegally putting expenses in a captive subsidiary to inflate their financials.  Our findings were confirmed by the DOE and the SEC cannot ignore. [Citron Research link] |

91.  Within approximately one hour of the public dissemination of these tweets and reports, defendant LEFT traded inconsistently with his public commentary in the LEFT Trading Accounts.

<u>Defendant LEFT's Deceptive Use of Investor Letters</u>

92.  In or around October 2018, defendant LEFT established Citron Capital, a purported hedge fund, to advance the false pretense that he successfully managed third-party investors' funds and was a credible investment adviser.

93.  On or about October 30, 2018, defendant LEFT provided the news outlet <u>Reuters</u> with a Citron Capital investor presentation that indicated that defendant LEFT earned an average annualized return of 89.98 percent from his trading between 2007 and 2017.  Defendant LEFT informed <u>Reuters</u> that, after investing only his own wealth for roughly two decades, he had launched a hedge fund, that he planned to

raise "a few hundred million dollars" from investors, and that he
would begin trading through the hedge fund in weeks.

94.    On or about July 17, 2019, defendant LEFT disseminated an
"investor letter" issued by Citron Capital asserting that, in the
first half of 2019, "the Fund generated a gross return of 36.6% and
net return of 24.7% after fees and expenses," and stating that, "the
managers of Citron would like to reassure our investors that our
focus remains on finding and trading around asymmetric opportunities
on both the long and short side with processes and insights that have
been developed over the past 20 years."

95.    On or about December 23, 2020, defendant LEFT falsely
represented that Citron had third-party investors in an interview in
which he stated, "My investors don't pay me to be right.  My
investors pay me to make money.  I'm not a professor.  I'm not
supposed to have some erudite answer about the Fed and its effect on
monetary flow.  Make money.  That's my directive from my investors."

96.    On the following occasions, defendant LEFT disseminated
"investor letters" to members of the news media to bolster his public
reputation by advancing the false pretense that he managed a hedge
fund with third-party investors:

    a.    On or about January 6, 2020, defendant LEFT
disseminated an "investor letter" issued by Citron Capital, stating
that in 2019, the hedge fund generated "a gross return of 56.4% and
net return of 43.3%."

    b.    On or about January 4, 2021, defendant LEFT
disseminated an "investor letter" issued by Citron Capital, stating
that in 2020, the hedge fund generated "a gross return of 202% and
net return of 155%."

97.  At all times, Citron Capital had no third-party investors; it entirely comprised defendant LEFT's funds.

### Invitae Corp. (NVTA)

98.  Defendant LEFT also used Citron's purported investor letters as catalysts, that is, as vehicles for manipulating the prices of Targeted Securities to benefit defendant LEFT's trading positions.

99.  On July 17, 2019, defendant LEFT sent Citron's investor letter for the first-half ("1H") of 2019 to members of the news media and stock commentators, who disseminated the content of the letter to the public.  In the letter, defendant LEFT stated, "Going into the second half of 2019, on the long side we're most excited about our position in Invitae (NVTA).  While Invitae was a contributor to fund performance during 1H 2019, we continue to add to our position at current levels" and "we see Invitae as the clear winner within the mega trend of the genetic testing market and expect the stock to trade to $100 in the next 24 months."

100. Beginning on or about the next day and continuing through the next week, while defendant LEFT was promoting Citron Capital's position in NVTA, he did not add to the fund's position.  Instead, defendant LEFT reduced the fund's position in the Citron IB Account in NVTA by:

        a.  20,000 shares on or about July 18;

        b.  30,000 shares on or about July 23; and

        c.  40,000 shares on or about July 25.

101. From on or about July 25 through on or about July 30, 2019, in private electronic communications with Individual D, defendant LEFT acknowledged his ability to artificially increase the price of

1   NVTA stating: "I can get stock [referring to NVTA's price] to 30" and

2   "what can I put in a tweet to juice it[?]".

3       102. On July 26, 2019, prior to publishing a positive Citron

4   tweet and report about NVTA, defendant LEFT bought call options in

5   the Citron IB Account, that positioned the fund to profit if NVTA's

6   stock price rose.

7       103. On July 30, 2019, in electronic communications, defendant

8   LEFT privately messaged Individual E, a portfolio manager at Hedge

9   Fund C, "NVTA you need to [own]."

10      104. On July 31, 2019, defendant LEFT posted on the Citron

11  Twitter Account with a link to a Citron report about NVTA.  The

12  report stated:

13          As noted in Citron Capital's 1H '19 investor letter, the
            fund has been long shares of Invitae ($NVTA) and will
14          continue to stay long until the stock hits at least $65 as
            we believe it is on its way to $100.

15
            Citron's conviction on Invitae was strengthened by this
16          week's purchase of Genomic Health ($GHDX) by Exact Sciences
            ($EXAS) in a $2.8 billion deal.
17
            We are not concerned about next week's earnings as we would
18          happily buy more on any dip – we have seen this movie
            before and have learned from our mistakes. Our only
19          question is who will acquire $NVTA?

20      105. That same day, on or about July 31, 2019, defendant LEFT

21  reduced the fund's position in NVTA by selling 130,000 shares in the

22  Citron IB Account.

23      106. During the following week, despite his statements on or

24  about July 31, 2019, defendant LEFT sold the remaining shares and 500

25  call option contracts in the Citron IB Account to significantly

26  reduce the fund's existing position in NVTA by approximately 65

27  percent.  From on or about July 17, 2019 to on or about August 6,

28

2019, the price of NVTA was within a range of approximately \$23 to \$28.

### Defendant LEFT's Attempts To Conceal His Scheme

### General Electric (GE)

107. On or about August 16, 2019, defendant LEFT initiated a media campaign to discredit another activist short seller's short report on GE and artificially inflate the price of GE stock to benefit defendant LEFT's trading positions.

108. On August 16, 2019, at approximately 8:12 a.m., defendant LEFT placed a limit order to buy 200,000 shares of GE stock at a price of \$8.34, which was filled by approximately 8:14 a.m.  At approximately 9:38 a.m., defendant LEFT placed a limit order to sell the same shares if GE's stock price increased to \$8.63.

109. At approximately 10:44 a.m., defendant LEFT posted to the Citron Twitter Account: "Markopolos report on \$GE was the worst that activist short selling has to offer.  Aggressive accounting is not fraud.  Disingenuous all the way through . . . ."  The post included a link that directed viewers to Citron's own GE report published on Citron's website.

110. Defendant LEFT made false and misleading representations in Citron's GE report to manipulate the price of GE's stock and benefit his own trading positions.  Specifically, defendant LEFT represented that, "Citron took the opportunity to buy stock as well."  In truth, at the time defendant LEFT made the statement, he had already placed an order to sell his shares, and within approximately one hour of posting Citron's tweet and report on GE, defendant LEFT had sold all of his shares of GE for a profit of at least \$70,000.

1      111. Defendant LEFT also emailed a link to Citron's GE

2    commentary to members of the news media, including CNBC, in an effort

3    to fraudulently bolster defendant LEFT's credibility by promoting the

4    false pretense that defendant LEFT was independent, and free from

5    financial conflicts of interest, and therefore, more credible than

6    other activist investors.  Specifically, Citron's commentary stated:

7             a.   Markopolos "is being paid a % of profits from an

8    unnamed hedge fund that is short GE," which had been the subject of a

9    recent short report by Harry Markopolos.  "No credible hedge fund or

10   short seller would ever do this."

11            b.   "[I]n 18 years of publishing, we [Citron] have never

12   been compensated by a third party to publish research.  More

13   important, compensation tied to the 'success of a trade' would not

14   pass internal compliance nor would it pass compliance of any fund

15   that Citron would collaborate with on ideas."

16            c.   "[U]sing full disclosures, short sellers have become

17   an important facet of self-regulation of the markets.  Unfortunately,

18   what we have just witnessed with Mr. Markopolos is reckless,

19   dishonest, and most importantly secretive -- all which gives activist

20   short selling a bad name."

21      112. In reality, defendant LEFT had, in fact, been compensated

22   by unnamed hedge funds that held short positions in the securities

23   targeted in Citron's commentary, and Citron had no "internal

24   compliance" limiting defendant LEFT's collaboration with hedge funds.

25      113. Indeed, between in or about September 2018 and December

26   2018, defendant LEFT received more than $1 million from Hedge Fund A,

27   and between in or about January 2019 and August 2019, defendant LEFT

28   and Individual A received more than $1 million from Hedge Fund B.

1    114. Defendant LEFT concealed his coordination with and
2    compensation from Hedge Fund A and Hedge Fund B from Citron's
3    followers, members of the media, regulators, and law enforcement,
4    among others, to further his scheme to manipulate the market and
5    defraud the investing public by perpetuating the false pretense that
6    his investment recommendations were credible and unbiased.

7    <u>Namaste Technologies (NXTTF) & India Globalization Capital (IGC)</u>

8    115. In or around September 2018, defendant LEFT entered into an
9    agreement with Hedge Fund A to execute a short campaign targeting
10   Namaste Technologies, Inc (NXTTF), a company whose securities were
11   traded over-the-counter.  At the time, Hedge Fund A was participating
12   in a bought offering -- where an investment bank commits to
13   purchasing an entire offering from a company and then apportions it
14   to other interested clients -- and stood to benefit if Citron's short
15   campaign caused NXTTF's stock price to decline.

16   116. On or about September 11, 2018, in exchange for defendant
17   LEFT's dissemination of negative information on NXTTF, Hedge Fund A
18   agreed to pay defendant LEFT a portion of Hedge Fund A's profits from
19   shorting NXTTF.

20   117. On or about September 14, 2018, on the Citron Twitter
21   Account, defendant LEFT called NXTTF a "total joke," and advised
22   investors to "drop it like its hot" -- a reference to a pledge party
23   hosted by NXTTF and iconic rapper Snoop Dogg that employees of Hedge
24   Fund A attended on September 11, 2018.

25   118. On or about September 25, 2018, in an interview for BNN
26   (Bloomberg TV's Canadian network), defendant LEFT discussed his
27   negative tweets about NXTTF and falsely stated, "I am going to keep
28   shorting [NXTTF] until it goes to zero."  Notwithstanding this

representation, the next day, in an electronic communication to an executive of Hedge Fund A, defendant LEFT asked, "Should we cover all Namaste and wait or keep some?"  The Hedge Fund A executive replied, "We should cover a bunch."

119. In or about October 2018, defendant LEFT and Hedge Fund A worked together to execute a short campaign targeting India Globalization Capital Inc. ("IGC"), a company whose securities were traded on the NYSE under the ticker IGC.

120. On or about October 2, 2018, on the Citron Twitter Account, defendant LEFT posted:

a.   "$IGC. If you are able to short, it is a gift.  No product.  All hype.  Raised Money 2 weeks ago at $1.15  Finger traders will get burned.  This hype stock is the poster child of a cannabis bubble.  Always cautious but nothing but air. Could write pages about this scheme."

b.   "Correction. $IGC has raised money 3 times in 3 weeks at an average price of $3.31.  At least the company is honest about the absurd move  The stock should have a skull and crossbones at Fidelity.  Just praying for more borrow to open up.  Target price - $6 fast[.]"

121. On or about October 4, 2018, on the Citron Twitter Account, defendant LEFT posted concerning NXTTF: "Citron proves without a doubt the fraud being committed at Namaste Tech $n $nxttf. This $700 mil company will be a 0 one regulators and accountants read."  He also included a link to a Citron short report on NXTTF.

122. Hedge Fund A's trading around defendant LEFT's short campaigns targeting NXTTF and IGC generated profits of more than $3.8

1  million.   Defendant LEFT's share of these profits was more than $1.1

2  million.

3        Defendant's Use of Fake Invoices to Obtain Funds from

4                          Hedge Fund A

5        123. Defendant LEFT participated in a scheme with Hedge Fund A

6  whereby Hedge Fund A would send defendant LEFT's share of the trading

7  profits through a third-party intermediary, Individual F, to conceal

8  the true beneficiary and purpose of the payments from Hedge Fund A to

9  defendant LEFT.  Specifically, Individual F received payments from

10  Hedge Fund A, supported by false invoices for research services with

11  the following dates, descriptions, and approximate amounts:

| Date | Description | Amount |
|------|-------------|--------|
| 10/08/18 | Research Services | $840,000 |
| 10/08/18 | Research Services | $390,000 |
| 10/08/18 | Research Services – Canopy Acquisitions & Slang | $100,000 |
| 10/15/18 | Research Services – Shopify | $250,000 |
| 10/22/18 | Research Services – Exchange Income | $210,000 |
| 10/26/18 | Research Services – Trupanion | $290,000 |
| 11/01/18 | Research Services – Arlo Netgear | $240,000 |
| 11/13/18 | Research Services – ACHC | $197,000 |

22        124. Individual F informed defendant LEFT upon receiving payment

23  for the false invoices from Hedge Fund A.

24        125. On or about the following dates, defendant LEFT sent false

25  "invoice" emails to Individual F that claimed to be invoices for

26  consulting services when, in fact, defendant LEFT did not provide any

27  consulting services to Individual F or Individual F's firm:

28

| Date | Description | Amount |
|------|-------------|--------|
| 11/21/18 | Consulting Services from Jan 1 to April 30, 2018 | $250,000 |
| 12/04/18 | Consulting Services from May 1 to June 31, 2018 | $250,000 |
| 12/17/18 | Consulting Services from July 1 to Sept 31, 2018 [*sic*] | $250,000 |
| 12/24/18 | Consulting Services from Sept 31 [*sic*]to Dec 31, 2018 | $250,000 |
| 12/31/18 | Consulting Services from Nov 1 to Dec 31, 2018 | $137,000 |

126. Upon receipt of the invoices from defendant LEFT, Individual F's firm sent wire transfers to a Citibank Account ending x7508, controlled by defendant LEFT, on or about the following dates and in the following approximate amounts:

| Date | Amount |
|------|--------|
| 11/26/18 | $250,000 |
| 12/05/18 | $250,000 |
| 12/17/18 | $250,000 |
| 12/24/18 | $250,000 |
| 12/31/18 | $137,000 |

127. On or about January 29, 2021, defendant LEFT knowingly and intentionally made the following materially false statements to a Postal Inspector from the USPIS while the Postal Inspector was in the Central District of California:

a.    When asked, "When you check with other hedge funds that specialize in the industry that you are looking at, is there compensation between the two of you?" defendant LEFT falsely stated that there was "[n]ever . . . never, never, never" compensation

36

between himself and hedge funds.  In fact, as defendant LEFT then

knew, from at least September 2018 through December 2018, defendant

LEFT received compensation from Hedge Fund A after consulting with

Hedge Fund A in advance of the issuance of Citron's commentary.

b.    When further asked, "Do you share your report before

it goes public with [hedge funds]?" defendant LEFT falsely stated,

"No, no, no, the only thing I might do . . . I might double check a

spreadsheet . . . . [I]t's always done to make sure it's factually

right."  In fact, defendant LEFT routinely shared the content of

Citron's commentary with hedge fund managers in advance of

publication to give them advanced notice and time to establish or

adjust their trading positions and thereby profit or minimize losses

from price volatility caused by Citron's publication.

128. On a date prior to January 30, 2021, electronic

communications between defendant LEFT and individual A were cleared

from the encrypted messaging app Telegram.

129. On or about February 1, 2021, the SEC provided defendant

LEFT and Citron Capital with subpoenas for documents and notice that

evidence, including, but not limited to, all communications through

and content on the Citron Twitter Account, should be preserved and

retained until further notice.  On or about March 14, 2023, despite

the SEC's directive to retain such records for an ongoing

investigation, defendant LEFT caused the deletion of electronic

communications contained in the Citron Twitter Account.

Defendant LEFT's Gains from the Fraudulent Scheme

130. In furtherance of the scheme to defraud investors,

defendant LEFT manipulated the market for at least 15 Targeted

Securities and thereby fraudulently obtained profits of at least $16 million through transactions in the LEFT Trading Accounts.

COUNTS TWO THROUGH SEVENTEEN

[15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5]

131. The Grand Jury realleges paragraphs 1 through 17 and 19 through 130 of this First Superseding Indictment here.

A.   THE SCHEME TO DEFRAUD

132. Beginning no later than in or about March 2018, and continuing through at least in or about October 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant LEFT, knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and the mails and facilities of NYSE and NASDAQ, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances by: (1) employing a scheme to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the market, including investors and potential investors in the Targeted Securities identified below, among others.

133. The scheme to defraud operated, in substance, as described in paragraphs 19 through 130 of this First Superseding Indictment.

B.   EXECUTIONS OF THE FRAUDULENT SCHEME

134. On or about the following dates, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendant LEFT directly and indirectly caused the use of a means and instrumentality of interstate commerce and the facilities of NYSE and NASDAQ in

39

connection with the purchase and sale of securities by issuing Citron reports and tweets concerning the following issuers:

| COUNT | DATE | ISSUER IN CITRON PUBLIC STATEMENT |
|---|---|---|
| TWO | 08/30/2018 | CRON |
| THREE | 10/04/2018 | NXTTF |
| FOUR | 10/18/2018 | PTE |
| FIVE | 10/23/2018 | TSLA |
| SIX | 11/20/2018 | NVDA |
| SEVEN | 12/20/2018 | TWTR |
| EIGHT | 12/26/2018 | FB |
| NINE | 01/08/2019 | ROKU |
| TEN | 05/17/2019 | BYND |
| ELEVEN | 07/31/2019 | NVTA |
| TWELVE | 08/16/2019 | GE |
| THIRTEEN | 01/31/2020 | LK |
| FOURTEEN | 04/20/2020 | NVAX |
| FIFTEEN | 06/05/2020 | AAL |
| SIXTEEN | 11/27/2020 | PLTR |
| SEVENTEEN | 12/23/2020 | XL |

COUNT EIGHTEEN

[18 U.S.C. § 1001(a)(2)]

135. The Grand Jury realleges paragraphs 1 through 17 and 19 through 130 of this First Superseding Indictment here.

136. On or about January 29, 2021, in Los Angeles County, within the Central District of California, and affecting the Federal Investigation in the Central District of California, and in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI, USPIS, the USAO, and DOJ, defendant LEFT knowingly and willfully made the following materially false statements and representations to USPIS knowing that these statements and representations were untrue:

     a.  Defendant LEFT falsely stated that he did not share Citron's reports with hedge funds before those reports became public except to check the factual accuracy of the report.  In truth, defendant LEFT routinely shared the content of Citron reports with hedge fund managers in advance of publication to afford them time to establish or adjust their trading positions and thereby profit or minimize losses from price volatility caused by Citron's publication.

     b.  Defendant LEFT falsely stated that he "never, never, never" exchanged compensation with a hedge fund after consulting with that hedge fund in advance of the issuance of a Citron report.  In truth, as defendant LEFT then knew, from at least September 2018 through December 2018, defendant LEFT received compensation from Hedge Fund A after consulting with Hedge Fund A in advance of the issuance of Citron's commentary.

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c)]

137. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant ANDREW LEFT's conviction of any of the offenses set forth in Counts One through Seventeen of this First Superseding Indictment.

138. Defendant LEFT, if so convicted, shall forfeit to the United States of America the following:

a.    All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense; and

b.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

139. Pursuant to Title 18, United States Code, Section 981(a)(1)(c), as incorporated by Title 28, United States Code, Section 2461(c), defendant LEFT, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has

1  been commingled with other property that cannot be divided without

2  difficulty.

3

4                                             A TRUE BILL

5

6                                             /S/
                                              _____
7                                             Foreperson

8  TODD BLANCHE                               LORINDA I. LARYEA
   Deputy Attorney General                   Chief, Fraud Section
9                                             Criminal Division
   BILAL A. ESSAYLI                           U.S. Department of Justice
10 First Assistant United States
   Attorney                                   LAUREN ARCHER
11                                            Trial Attorney
                                              MATTHEW REILLY
12                                            Acting Assistant Chief
                                              Fraud Section
13 ALEXANDER B. SCHWAB                        Criminal Division
   Assistant United States Attorney          U.S. Department of Justice
14 Acting Chief, Criminal Division

15 BENEDETTO L. BALDING
   DAVID Y. PI
16 Assistant United States Attorneys
   Transnational Organized Crime/Major
17 Frauds Sections

18

19

20

21

22

23

24

25

26

27

28

                                43