**DYNAMIS LLP**

ERIC S. ROSEN (*pro hac vice*)
erosen@dynamisllp.com
MICHAEL B. HOMER (*pro hac vice*)
mhomer@dynamisllp.com
225 Franklin St., 26th Floor
Boston, Massachusetts 02110
(617) 802-9157

YUSEF AL-JARANI (Cal. Bar No. 351575)
yaljarani@dynamisllp.com
1100 Glendon Ave., 17th Floor
Los Angeles, California 90024
(213) 283-0685

AARON KATZ (*pro hac vice*)
akatz@aaronkatzlaw.com
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305

*Attorneys for Defendant Andrew Left*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 2:24-cr-00456-VAP |
| v. | **DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS, IN PART, THE FIRST SUPERSEDING INDICTMENT** |
| ANDREW LEFT, | |
| Defendant. | Date:     March 26, 2026 |
| | Time:     11:00 a.m. |
| | Ctrm:     6A |
| | Judge:    Hon. Virginia A. Phillips |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 26, 2026, at 11:00 a.m., or as soon after as the matter may be heard, in Courtroom 6A of the above-captioned Court, located at 350 West 1ˢᵗ Street, Los Angeles, CA 90012, before the Honorable Virginia A. Phillips, Defendant Andrew Left moves for an Order dismissing, in part, the First Superseding Indictment.

The Motion is based on this Notice of Motion and Motion, the incorporated Memorandum of Points and Authorities, and any other evidence or argument that the Court may consider at the hearing on this motion. For the reasons in the accompanying Memorandum of Points and Authorities, Mr. Left respectfully asks the Court to grant this Motion.

The parties communicated about the substance and potential resolution of the Motion via email but could not reach agreement. *See* Rosen Decl. ¶ 3.

Dated: February 18, 2026

Respectfully submitted,

DYNAMIS LLP

*/s/ Eric S. Rosen*
Eric S. Rosen (*pro hac vice*)
Michael B. Homer (*pro hac vice*)
Yusef Al-Jarani
Aaron Katz (*pro hac vice*)

*Attorneys for Defendant Andrew Left*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND RELEVANT TO COUNT ONE ................................ 2

ARGUMENT .................................................................................................... 6

I.    COUNT ONE IS DUPLICITOUS AND MUST BE DISMISSED. .................................. 6

   A.    Legal Standard for a Duplicitous Indictment ......................................... 6

   B.    The Proper Unit of Prosecution for 18 U.S.C. § 1348 Is Each Covered
         Security. ............................................................................................... 7

   C.    Count One of the FSI Is Duplicitous. .................................................... 8

   D.    Jury Instructions Cannot Cure This Duplicitous Count. ....................... 11

   E.    Mr. Left Is Highly Prejudiced from This Duplicitous Charge. ............. 14

   F.    In the Alternative, This Court Should Dismiss All Time-Barred
         Allegations. ......................................................................................... 15

II.   ALLEGATIONS IN THE INDICTMENT PREMISED ON MR. LEFT'S ALLEGED
      "CONCEALMENT" OF MATERIAL INFORMATION MUST BE DISMISSED. ............. 16

   A.    Absent a Duty to Disclose, Securities-Fraud Charges Cannot Be Based
         on a Concealment or Omissions Theory of Fraud. ............................... 16

   B.    To the Extent the Superseding Indictment Is Premised on Omissions-
         Based Fraud, that Portion Must Be Dismissed. .................................... 17

CONCLUSION ................................................................................................ 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ......................................................................................... 17

*Chiarella v. United States,*
  445 U.S. 222 (1980) ......................................................................................... 21

*Eller v. EquiTrust Life Ins. Co.,*
  778 F.3d 1089 (9th Cir. 2015) ........................................................................ 17

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ......................................................................................... 19

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ........................................................................................... 17

*Stoyas v. Toshiba Corporation,*
  896 F.3d 933 (9th Cir. 2018) ............................................................................ 8

*United States v. Adamson,*
  291 F.3d 606 (9th Cir. 2002) .................................................................... 12, 13

*United States v. Ali,*
  620 F.3d 1062 (9th Cir. 2010) ........................................................................ 17

*United States v. Bradford,*
  148 F.4th 699 (9th Cir. 2025) ......................................................................... 14

*United States v. Constantinescu,*
  2023 WL 5628607 (S.D. Tex. 2023) ......................................................... 10, 11

*United States v. Garlick,*
  240 F.3d 789 (9th Cir. 2001) ............................................................................ 7

*United States v. Hinton,*
  127 F. Supp. 2d 548 (D.N.J. 2000) ......................................................... 8, 9, 11, 13

*United States v. Holmes,*
  2020 WL 666563 (N.D. Cal. 2020) ............................................................ 17, 21

*United States v. Hussain,*
  972 F.3d 1138 (9th Cir. 2020) ..................................................................... 8, 11

*United States v. King,*
  200 F.3d 1207 (9th Cir. 1999) .......................................................................... 6

- iii -

*United States v. Laurienti,*
   611 F.3d 530 (9th Cir. 2010)................................................................17

*United States v. Lonich,*
   2016 WL 324039 (N.D. Cal. 2016)........................................16, 17, 22

*United States v. Mahaffy,*
   693 F.3d 113 (2d Cir. 2012)................................................................21

*United States v. Mancuso,*
   718 F.3d 780 (9th Cir. 2013).................................................................6

*United States v. Mattia,*
   2021 WL 2012698 (D. Ariz. 2021).......................................................6

*United States v. Miranda–Guerena,*
   445 F.3d 1233 (9th Cir. 2006).............................................................19

*United States v. Motz,*
   652 F. Supp. 2d 284 (E.D.N.Y. 2009).................................................21

*United States v. Omer,*
   395 F.3d 1087 (9th Cir. 2005).............................................................16

*United States v. Pacific Gas and Electric Company,*
   153 F. Supp. 3d 1084 (N.D. Cal. 2015) ................................................7

*United States v. Poliak,*
   823 F.2d 371 (9th Cir. 1987).................................................................7

*United States v. Skelly,*
   442 F.3d 94 (2d Cir. 2006)..................................................................17

*United States v. Yagman,*
   2007 WL 9724388 (C.D. Cal. 2007)......................................................6

*United States v. Zalapa,*
   509 F.3d 1060 (9th Cir. 2007)...............................................................6

*United States v. Zolp,*
   479 F.3d 715 (9th Cir. 2007).................................................................2

*Zweig v. Hearst Corp.,*
   594 F.2d 1261 (9th Cir. 1979).............................................................21

## Statutes

15 U.S.C. § 78j(b) .....................................................................................8

18 U.S.C. § 1341 .......................................................................................7

- iv -

18 U.S.C. § 1343 ............................................................................................ 7

18 U.S.C. § 1344(1) .................................................................................... 7, 8

18 U.S.C. § 1348 ................................................................................... Passim

18 U.S.C. § 1348(1) ............................................................................. Passim

18 U.S.C. § 3301 ......................................................................................... 15

**Rules**

Fed. R. Crim. P. 8(a) ..................................................................................... 6

1

## **INTRODUCTION**

2      Count One is duplicitous and must be dismissed. Section 1348(1) criminalizes

3   "a scheme or artifice … to defraud any person in connection with *any security*"

4   properly registered or reported under either Section 12 or 15 of the Securities

5   Exchange Act of 1934 (the "1934 Act"). 18 U.S.C. § 1348(1) (emphasis added).

6   Congress's use of the singular— "any security"—defines the unit of prosecution as

7   per-security, not per-scheme. Despite this, Count One includes: 21 separate securities

8   traded over a more than five-year period, hundreds of separate securities' transactions,

9   two competing securities-fraud schemes (one that allegedly inflated stock prices—

10  pump-and-dump—and the other that allegedly deflated stock prices—short-and-

11  distort), and multiple other fraud-based schemes (*i.e.*, "fake invoice" scheme, Twitter

12  deletion scheme, and "deceptive" investor-letter scheme) that do not touch on *any*

13  securities' transactions. This impermissible joinder of numerous distinct offenses in

14  one count violates Mr. Left's Fifth and Sixth Amendment rights to notice, jury

15  unanimity, and double-jeopardy protection.

16      In addition, Count One charges Mr. Left with conducting two contradictory

17  schemes: what the government calls a "hybrid pump-and-dump and short-and-distort

18  scheme." (Dkt. 126 at 8). These are distinct offenses that are the *opposite* of each

19  other. Furthermore, because Section 1348 requires the fraud to be "in connection

20  with" a covered security, many of the allegations contained within Count One—*i.e.*,

21  the fraudulent-invoice scheme, the investor-letter scheme, the deletion of Twitter

22  data, the alleged lying to the SEC years after securities were purchased and sold, and

23  others—are not connected with *any* security and therefore cannot be a crime under

24  Section 1348. Thus, not only will this smorgasbord count confuse the jury, but the

25  amalgamation of Mr. Left's conduct into a single count risks a conviction for conduct

26  unrelated to the statute it is brought under.

27

28

1    Finally, it is well-settled law that a scheme to defraud—the heart of all the

2    securities-fraud counts in the Indictment—requires either false statements and

3    misrepresentations or the concealment of material facts. However, an indictment

4    premised on an omissions or concealment theory must also plead an affirmative duty

5    of a defendant to disclose those facts. Here, no such duty is pled. Accordingly, to the

6    extent the securities-fraud counts are premised on concealment or omissions, that

7    portion of the Indictment also must be dismissed.

8    **FACTUAL BACKGROUND RELEVANT TO COUNT ONE**

9    Count One of the First Superseding Indictment ("FSI" or "Indictment") alleges

10   that from March 2018 through October 2023, Mr. Left "knowingly and with intent to

11   defraud, devised, participated in, and executed a scheme *to defraud investors and*

12   *potential investors* in connection with securities" of issuers either registered under

13   Section 12 of the 1934 Act, or that were required to file reports under Section 15(d)

14   of the 1934 Act. (FSI ¶18) (emphasis added). The charged scheme was one designed

15   to cheat investors who purchased securities covered by Section 1348(1).

16   The "Operation of the Scheme" section, while purporting to describe a single

17   "scheme to defraud," makes clear that this "scheme" actually involved multiple

18   different schemes and sub-schemes involving more than 21 separate securities and

19   unrelated acts. (*Id.* ¶19).

20   *First*, the FSI alleges Mr. Left made bullish recommendations to inflate prices

21   while concealing a premeditated intent to sell—an alleged "pump-and-dump"—for

22   the following securities: Facebook, General Electric, Luckin Coffee, Nvidia, Invitae,

23   and Tesla. (*Id.* ¶¶36–55, 65–69, 98–114).[1]

24   ---

25   [1] To be clear, the defense does not agree that the Indictment pleads a pump-and-dump
     scheme. As defined by the Ninth Circuit, a pump-and-dump scheme involves "the

26   touting of a company's stock (typically microcap companies) through *false and*
     *misleading statements* to the marketplace," after which "fraudsters make huge profits

27   by selling their cheap stock into the market." *United States v. Zolp*, 479 F.3d 715, 717

28

*Second*, the FSI alleges the opposite: Mr. Left made bearish recommendations to deflate prices while planning to cover short positions—a "short-and-distort"—for the following securities: American Airlines, Beyond Meat, Chegg, Cronos, Fleetcor, Grand Canyon Education, McKesson, Namaste Technologies, Novavax, Twitter, India Globalization Capital, Palantir, PolarityTE, Roku, and XL Fleet. (FSI ¶¶21–35, 56–64, 70–88, 90–91, 115–122). For one charged stock, Namaste, the government fails to allege the stock is registered or issued by a reporting company under Section 12 or 15(d) of the 1934 Act. (*Id.* ¶15) (omitting Namaste as a covered stock). Accordingly, it is not subject to 18 U.S.C. § 1348(1). Namaste is nevertheless included as part of Count One. (*Id.* ¶¶115–122).

Together, Count One sweeps all 21 securities and both schemes into a single charge. Pump-and-dump and short-and-distort are not variations of the same scheme; they are opposite schemes requiring opposite proof. The economic incentives, direction of the alleged manipulation, trading mechanics, and risk profiles are all reversed. By charging directionally opposite schemes in a single count, the government has ensured a jury could convict Mr. Left on Count One without unanimously agreeing which scheme he committed, or whether he was inflating or deflating any particular security's price.

Further, the conduct alleged as a "single" scheme took place over a five-and-a-half-year period from March 2018 through October 2023. However, while the scheme allegedly began in March 2018, the first at-issue stock was not traded until August 30, 2018, and there are no at-issue stocks traded *after* December 23, 2020. (*Id.* ¶134). Thus, for the half-year preceding any trades and three-year period after trading ceased, there were no alleged improprieties amongst any of the charged tickers. Instead, as

---

n.1 (9th Cir. 2007). False and misleading statements to increase the stock price are *required* for pump-and-dump schemes. The government seems to believe that any statement—true or false—that moves the market is an illegal "pump-and-dump."

part of this alleged single scheme, the Indictment references acts taken years *after* the last sale of stock—*e.g.*, Mr. Left deleted Citron's Twitter account on March 14, 2023, 27 months after the last stock was traded (*id.* ¶129), and allegedly made false representations during his October 2023 testimony before the SEC, 34 months after the last stock was traded. (*Id.* ¶28). This sporadic timeline indicates the allegedly fraudulent actions were isolated incidents, not a single cohesive scheme. Indeed, it is hard to fathom how deleting a public Twitter account—in effect, failing to disseminate statements to the investing public—could be part of a scheme to deceive investors through false and misleading statements.

The Indictment also makes clear the fraudulent trades were conducted in fundamentally different manners. Namaste and Indian Globalization Capital, for example, were not traded by Mr. Left at all. With respect to Polarity, he actually increased his short position *after* tweeting that the stock was overvalued. (*Id.* ¶33). Mr. Left entered limit orders to sell stock or options automatically after publication for some stocks (*e.g.*, *id.* ¶46), but for the vast majority, he declined to do so (*e.g.*, *id.* ¶55). He is alleged to have begun selling or covering some stocks minutes after a tweet (*e.g.*, *id.* ¶¶62, 68), while for others he allegedly waited an hour after tweeting to begin sales. (*Id.* ¶90). And while Mr. Left is alleged to have exited entire positions within hours for some stocks, for others he allegedly waited days or even weeks. (*Id.* ¶69, ¶¶98–106). In short, for 21 separate issuers (one of which is not covered by the statute), the FSI alleges 21 separate schemes.

Last, buried within Count One are multiple independent schemes with no connection to a particular security, let alone a scheme targeted at "investors and potential investors" in covered securities. For example, the Indictment alleges the use of "fake invoices" to obtain funds from Hedge Fund A. (*Id.* ¶¶123–29). But the tweet about the at-issue security allegedly occurred on October 4, 2018, and the payments

- 4 -

1  secured by those invoices were not sent to Mr. Left until months later. (*Id.* ¶126).

2  Thus, the alleged "consulting" invoices are not only not sufficiently "in connection

3  with" a *security* as required for prosecution under 18 U.S.C. § 1348, but, as alleged,

4  were *not* directed to outside investors at all—the very object of the scheme.

5      The Indictment also describes the "deceptive use of investor letters … to

6  advance the false pretense that he successfully managed third-party investors' funds

7  and was a credible investment advisor." (*Id.* ¶¶92–96). But the allegations do not

8  reference *any* particular stock, let alone one covered by 18 U.S.C. § 1348. No one is

9  alleged to have purchased any stock based on the letters. This scheme also centers

10  around innocuous comments about a client Mr. Left made on a podcast on December

11  23, 2020. (*Id.* ¶95). There are no allegations he mentioned any specific securities on

12  that podcast, or that anyone purchased a security based on his comments.[2] Similarly,

13  there are no allegations showing the deletion of tweets or alleged lies to the SEC in

14  2023 could have been part of a scheme to defraud investors in the covered securities.

15      All these disparate actions are jumbled together as a "single" scheme spelled

16  out in Paragraph 19, which has nine sub-paragraphs (a) to (i). (*Id.* ¶19). One sub-

17  paragraph, (e), has five sub-sub-paragraphs. (*Id.*) Another sub-paragraph (i) has three

18  sub-sub-paragraphs. (*Id.*) These paragraphs, sub-paragraphs, and sub-sub-paragraphs

19  purport to link together a single scheme, but make clear this Count actually consists

20  of many *different* schemes. There are no less than *five* schemes to: (1) publish

21  information then close positions (subsections (a)–(d)); (2) make it appear Citron's

22  commentary was not "tainted by any conflict of interest" (sub-subsection (e)(i));

23  (3) use "target prices" and "maximize the impact of Citron's commentary" (sub-

24  subsections (e)(iii)–(iv)); (4) make it appear Citron managed outside investors' money

---

[2] The only connection between an investment letter and a charged security is the mention, in a July 17, 2019 letter, of Invitae. (FSI ¶99). But the alleged fraud concerning Invitae was *not* due to representations that Citron was a "purported hedge fund," but because of comments in the letter about the company itself. (*Id.*)

28

1  (subsection (h)); and (5) conceal coordination with hedge funds (subsection (i)). (*Id.*)

2  While some of these disparate schemes are linked to specific securities, others have

3  nothing to do with any charged (or even uncharged) stock.

### ARGUMENT

**I.    Count One Is Duplicitous and Must Be Dismissed.**

**A.    Legal Standard for a Duplicitous Indictment**

An indictment is "duplicitous when it joins two or more distinct and separate offenses into a single count." *United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir. 2013); *see also* Fed. R. Crim. P. 8(a) (separate offenses should be charged in separate counts). A duplicitous indictment "compromises a defendant's Sixth Amendment right to know the charges against him, as well as his Fifth Amendment protection against double jeopardy." *United States v. King*, 200 F.3d 1207, 1212 (9th Cir. 1999). Another "vice of duplicity is that there is no way in which the jury can convict on one offense and acquit on another offense contained in the same count." *United States v. Yagman*, 2007 WL 9724388, at *6 (C.D. Cal. 2007) (citation omitted). "A general verdict of guilty will not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty at all." *Id.*

To determine whether an indictment is duplicitous, a court must first identify the "unit of prosecution"—a single distinct criminal offense for which a defendant can be charged. *See, e.g.*, *United States v. Zalapa*, 509 F.3d 1060, 1062 (9th Cir. 2007); *United States v. Mattia*, 2021 WL 2012698, *1 (D. Ariz. 2021). For that, courts generally look to the wording of the statutory provision at issue, legislative intent, analogous statutes, and constitutional considerations such as notice and jury unanimity. *See, e.g.*, *United States v. Pacific Gas and Electric Company*, 153 F. Supp. 3d 1084, 1090–92 (N.D. Cal. 2015). When a court finds duplicity, the court must, if

jury instructions cannot cure the issue, dismiss the duplicitous count or require the government to elect which single offense to prosecute.

**B.    The Proper Unit of Prosecution for 18 U.S.C. § 1348 Is Each Covered Security.**

18 U.S.C. § 1348(1) is not a general fraud statute, but makes it a crime to "execute[], or attempt[] to execute, a scheme… to defraud any person in connection with… **any security** of an issuer" required to register securities or file reports.

*First*, Congress used singular language. The statute speaks to a person being defrauded in connection with *one* qualifying security. Congress could have said "any securities," but it didn't.

*Second*, § 1348 was enacted in 2002 as part of the Sarbanes-Oxley Act and was modeled on existing fraud statutes, particularly mail, wire, and bank fraud. Compare the operative language:

| Statute | Language | Unit of Prosecution |
|---|---|---|
| Mail Fraud 18 U.S.C. § 1341 | "for the purpose of **executing** such scheme… places in any post office… **any matter**" | Each mailing[3] |
| Wire Fraud 18 U.S.C. § 1343 | "for the purpose of **executing** such scheme… transmits… by **means of wire**" | Each wire transmission[4] |
| Bank Fraud 18 U.S.C. § 1344(1) | "a scheme… to defraud **a financial institution**" | Each financial institution or financial transaction[5] |

By analogy, then, each security is a separate offense. The federal fraud statutes punish not the mere presence of but the (potential) *execution* of a scheme tied to a specific function—the mailing of a check, the sending of a wire, the use of a particular institution, or, in this case, the trading of a particular covered security.

---

[3] *See United States v. Garlick*, 240 F.3d 789, 792–93 (9th Cir. 2001); *United States v. Poliak*, 823 F.2d 371, 372 (9th Cir. 1987).

[4] *Garlick*, 240 F.3d at 792–93; *Poliak*, 823 F.2d at 372.

[5] *Garlick*, 240 F.3d at 793; *Poliak*, 823 F.2d at 372.

- 7 -

That a "security" is the unit of prosecution is confirmed by the statute's use of the phrase "in connection with any security." The "in connection with" requirement clearly ties the offense—execution of a scheme to defraud—to a jurisdictional element—a specific security covered by the 1934 Act, not securities generally. The Ninth Circuit held that § 1348's "in connection with" a covered security requirement is functionally the same as the 1934 Act's Title 15 "in connection with the purchase or sale" of a security requirement. *United States v. Hussain*, 972 F.3d 1138, 1147 (9th Cir. 2020)*. Under this standard, the fraud "must 'touch' the sale—*i.e.*, it must be done to induce *the purchase at issue*." *Stoyas v. Toshiba Corporation*, 896 F.3d 933, 951 (9th Cir. 2018) (emphasis added). Notably, "[d]eception related to the value or merit *of the securities in question*" is sufficient. *Id.* at 951 (emphasis in original) (citation omitted). That a securities-fraud scheme must relate to a specific security is further made clear by the Ninth Circuit's model jury instructions, which instruct that a defendant's unlawful conduct must be "in connection with the [purchase] [sale] of [*specify security*]." *Manual of Model Criminal Jury Instructions*, Ninth Circuit, No. 15.47 (15 U.S.C. § 78j(b)), https://www.ce9.uscourts.gov/jury-instructions/node/1059 (emphasis in original). In short, general fraud or fraud related tangentially to securities is insufficient; the fraud must be in connection with a "specific security."

### C.    Count One of the FSI Is Duplicitous.

**The Government cannot charge multiple securities within a single count under § 1348**. Because the Title 18 securities-fraud statute is seldom used, there does not appear to be any case directly on point. However, *United States v. Hinton*, 127 F. Supp. 2d 548 (D.N.J. 2000), considered nearly the exact same statute but for schemes to defraud financial institutions. *See* 18 U.S.C. § 1344(1). In *Hinton*, the government charged fraud perpetrated against six separate financial institutions as a *single scheme*. 127 F. Supp. 2d at 553. The government argued the count was not duplicitous because

- 8 -

all the means and methods were "included in the scope of the single, unified scheme to defraud six financial institutions," *id.*, but the court rejected this argument. *Id.* at 556. The court held that each financial institution must be charged as a separate count because the plain language of the statute concerned a "financial institution," not "financial institutions." *Id.* at 554. That would be true "even if distinct similarities in the means and methods of the schemes directed against each bank exist in the proofs." *Id.* at 556.

If the scheme in *Hinton* was duplicitous, the scheme charged here *must* be duplicitous. In *Hinton*, there were six banks; here, there are 21 issuers lumped into a single count. *Id.*; (FSI ¶19). In *Hinton*, the defendant used similar methods across the banks. 127 F. Supp. 2d at 556. Here, there are two distinct methods—pump-and-dump vs. short-and-distort. (FSI ¶19). In *Hinton*, all the financial institutions appeared to be properly covered by the bank-fraud statute. 127 F. Supp. 2d at 556. Here, Namaste is not even alleged to be a covered security but is *still* part of the fraud scheme. (FSI ¶19). In *Hinton*, all the activities appeared geared towards defrauding banks. 127 F. Supp. 2d at 548–49. Here, the securities-fraud scheme includes numerous different sub-schemes that have nothing to do with the purchase or sale of a specific security. (FSI ¶¶19, 115–22).

**Section 1348 punishes the "execution" of the scheme, and the Indictment makes clear that each security was executed as a separate scheme**. For example, as alleged, execution of the Cronos scheme began on August 27–28, 2018, continued on August 30, 2018 when Mr. Left began building a short position, and ended on or about August 31, 2018 when he described his trading to "Individual B." (*Id.* ¶¶21–28). Similarly, the Nvidia alleged scheme began execution on November 20, 2018 when Mr. Left began building a position, and ended that same day when he closed his

- 9 -

position. (*Id.* ¶¶41–44). Each of the tickers involves a discrete series of events ending with closing a position.

**In addition to the 21 separate tickers, Count One includes a number of sub-schemes that have nothing to do with a particular security (let alone a security covered by the statute) and are immaterial as a matter of law**. The smorgasbord that is Count One includes a number of sub-schemes having nothing to do with a specific covered security, or with defrauding investors or potential investors at all. The "fake invoices" scheme involved conduct that was never made public, occurred months after the charged public statement, and largely concerned a company, Namaste, not covered by the statute. Yet this is part of Count One. The "investor letters" scheme highlights a number of letters and statements that have virtually nothing to do with any charged ticker. Only a single ticker, NVTA, is even mentioned in one letter. Count One also includes lies apparently made to the SEC in 2023 and the deletion of tweets in 2023, years *after* the last covered security even traded. These acts *cannot* be part of a scheme to defraud investors. The Indictment even alleges that a private comment to a CNBC producer concerning Mr. Left's short position was "materially misleading" because he failed to disclose in an email *to that producer* that he had "covered nearly his entire short position" by the time of the email. (FSI ¶63). None of this concerns any covered security, and certainly none of it "touches" the purchase or sale of a security, as is required. Further, the Indictment's allegations regarding private invoices, a private email to a CNBC producer, private investor letters, tweet deletions, and alleged statements to the SEC all concern communications or conduct that investors never heard or saw, and thus cannot be material to any investment decision as a matter of law.

**The government's method of charging here is inconsistent with how it has charged similar cases**. For example, in *United States v. Constantinescu*, 22-CR-

00612 (S.D. Tex.), which involved an alleged social-media-based scheme to pump and dump securities concerning 18 tickers, each ticker was charged as a separate securities-fraud count under § 1348. *See* Ex. A, Superseding Indictment, *United States v. Constantinescu*, 22-CR-00612, ¶¶120–21 (S.D. Tex. Feb. 8, 2023). The government applied the proper unit of prosecution to charge each security separately under § 1348, with a general conspiracy count covering all the at-issue tickers. (*Id.* ¶¶116–19). Here, there is no conspiracy count. Instead, all the tickers are lumped into a single securities-fraud count alongside a potpourri of non-securities-related fraud.

The other charges in the FSI confirm Count One is duplicitous. In addition to Count One, the FSI charges 16 counts of securities fraud under Title 15 of the 1934 Act. Each Title 15 charge relates to a single statement involving a single issuer. But as the Ninth Circuit has made clear, there are no substantive differences in the units of prosecution for Title 15 and Title 18. *See Hussain*, 972 F.3d at 1147. The "in connection with" requirement—the jurisdictional hook that makes misstatements and deceit securities fraud—is the *same* for both Title 15 and Title 18. *Id.* Thus, the government's use of a ticker-by-ticker count structure for the Title 15 counts is a concession that the Title 18 count should have been structured in the same manner.

### D. Jury Instructions Cannot Cure This Duplicitous Count.

In *Hinton*, the court also rejected the government's argument that jury instructions could cure duplicity. 127 F. Supp. 2d at 555. The court was "unconvinced that it could craft jury instructions that would ensure juror unanimity for a single scheme and overcome the potential problems associated with the government's attempt to charge one fraud scheme against six different financial institutions in a single count indictment." *Id.* If the *Hinton* court could not craft jury instructions to ensure jury unanimity for allegations covering six institutions over 15 months, it would be nearly impossible to ensure unanimity for allegations extending over 21

securities (one of which is not covered by the statute), five-and-a-half years, two entirely distinct (and incompatible) schemes, and a plethora of other mini-schemes having nothing to do with the purchase or sale of a security.

What would the jury instructions say? Count One includes conduct that could constitute a crime under § 1348 (the alleged scalping of each covered security) as well as significant conduct not covered by § 1348 (the false invoices, investor letters, deletion of tweets, alleged lie to the CNBC producer, public statements regarding Namaste, and alleged lies to the SEC). This puts the Court in a bind—instructions that pare down the Indictment to include only conduct constituting criminal activity under § 1348 would constructively amend the Indictment. *See United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) (constructive amendment of an indictment occurs where (a) "there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument," or (b) "the crime charged [in the indictment] *was substantially altered at trial*, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved") (emphasis added). Constructive amendment is not permitted, and, if it occurs, "always requires reversal." *Id.* The examples below demonstrate how this could play out:

<u>Unanimity on a Single Security</u>: The jury instruction could say: "To convict on Count One, you must unanimously agree the government proved that the fraud scheme involved at least one of the 21 securities." This would authorize conviction without requiring the jurors to identify a particular security. That unidentified security could be Namaste, which is charged in Count One, but not covered by the operative statute. Therefore, this instruction could result in conviction for a crime that does not exist. This instruction would also constructively amend the Indictment—if the charged scheme involved 21 securities, reducing the scheme to just one would substantially alter the charged count.

- 12 -

<u>Unanimity on All 21 Securities</u>: Such an instruction would require the jury to convict on Namaste, which is not a covered security. In addition, Mr. Left could be convicted of a crime not endorsed by the grand jury. If the grand jury was, for example, persuaded only on the false-invoices evidence but not on any of the 21 stocks, that would be a fatal variance or constructive amendment requiring reversal.

<u>Unanimity on the Scheme</u>: The instruction could say: "You must unanimously agree the government proved the scheme to defraud alleged in the Indictment existed and was executed." But again, Count One contains: (1) a singular scheme charging all 21 securities; (2) a scheme including both potentially criminal and non-criminal conduct; and (3) a scheme including conduct that has nothing to do with defrauding investors or potential investors in the covered securities. The Indictment does not distinguish between covered and non-covered securities, or criminal and non-criminal conduct. Any attempt by this Court to limit the scheme to only evidence of the 20 covered securities (excluding Namaste) and the potentially criminal conduct under § 1348 would again result in a scheme altered from the Indictment so much that it would have been "impossible to know whether the grand jury would have indicted" Mr. Left for the crime ultimately proven. *Adamson*, 291 F.3d at 615.

<u>Special Verdict Form to Guarantee Unanimity</u>: The government may argue that a unanimous verdict could be guaranteed if the jury is provided with a list of all 20 covered securities and is required to check a box next to each security that the jury unanimously agrees amounted to a separate scheme to defraud. In *Hinton*, the court correctly noted that such an arrangement does not satisfy complex cases: "Even if the Court were able to compose lengthy and detailed instructions to be presented to a jury … it is unlikely that such instructions could adequately inform jurors about what facts would have to be found with respect to which financial institutions to constitute a scheme and obtain a conviction." 127 F. Supp. 2d at 555. Here, to have the jury sift

- 13 -

1   through all the complex facts to ascertain, with respect to every security, whether
2   there were sufficient facts to sustain a conviction would be a recipe for disaster. And
3   even if the Court did require such a special verdict form, that form would necessarily
4   have to eliminate Namaste and the non-criminal conduct introduced into Count One,
5   which would, again, constructively amend the Indictment.

6        **E.**    **Mr. Left Is Highly Prejudiced from This Duplicitous Charge.**

7        Even if instructions could cure the duplicity (they cannot), there are a host of
8   other issues that would result in significant prejudice to Mr. Left throughout trial.

9        *First*, duplicity may "also give rise to problems regarding the admissibility of
10  evidence." *United States v. Bradford*, 148 F.4th 699, 705 (9th Cir. 2025). Here, as
11  charged, the single securities-fraud scheme contains multiple sub-schemes with no
12  connection to the purchase or sale of securities. While the defense will file multiple
13  motions *in limine* to exclude this evidence on various grounds, the government will
14  no doubt argue that the evidence is admissible because it is charged together in the
15  alleged overall scheme in Count One. Should the Court agree with the government
16  and admit the evidence, Mr. Left would be highly prejudiced because he would have
17  to defend against evidence the government has improperly claimed to be criminal
18  securities fraud, such as the consulting invoices, but is not.

19       *Second*, duplicity violates the Sixth Amendment because it prevents a
20  defendant from knowing for what he has been charged. Has Mr. Left been charged
21  with a single criminal act encompassing all 21 securities such that a conviction on
22  each security is necessary to convict on the umbrella criminal act? Or are the securities
23  simply meant to accomplish a singular scheme such that conviction on each individual
24  security is not necessary to complete the act? Is each separate sub-scheme, like the
25  fake-invoice scheme or investor-letter scheme, considered a separate crime such that
26  a jury could convict on that evidence alone despite its lack of connection to a covered

27
28

security? And as to the deletion of tweets and alleged misrepresentations to the SEC, does the FSI allege this standalone conduct is sufficient to warrant conviction under § 1348, or does the statute require more? None of these questions have been answered by the government.

*Third*, the FSI contains four statements about new tickers that were not charged in the initial Indictment: CHGG, FLT, MCK, and LOPE. (FSI ¶¶90–91). These are not charged as four counts; instead, all four tickers are inserted into the omnibus Count One. Yet all four stocks concern conduct that occurred *more than six years* before the Superseding Indictment was returned. The last charged statement was on January 28, 2020, while the Superseding Indictment came down on February 4, 2026—six years and seven days after the charged conduct. Given that the statute of limitations for § 1348 is six years, *see* 18 U.S.C. § 3301, conduct relating to the four new stocks lies outside the limitations period. The government cannot make an end-run around the statute of limitations by lumping this inactionable conduct into an omnibus count.

*Fourth*, the Namaste stock is not covered by § 1348. By including it in Count One and calling the conduct about this ticker "criminal" under Title 18, Mr. Left would be forced to defend himself against conduct that is not proscribed by the criminal statute—an impossible position.

### F. In the Alternative, This Court Should Dismiss All Time-Barred Allegations.

As discussed above, the FSI includes new allegations concerning four stocks—CHGG, FLT, MCK and LOPE. The "fraud" alleged as to each of these stocks occurred more than six years before the FSI was filed, making it time-barred. Should this Court agree that the unit of prosecution for § 1348 is each covered stock, but decide to not dismiss the Count at this time because this Court believes jury instructions can cure duplicity (or for any other reason), the defense asks that the allegations in ¶¶90–91 be stricken from the FSI as time-barred.

- 15 -

**II.    Allegations in the Indictment Premised on Mr. Left's Alleged "Concealment" of Material Information Must Be Dismissed.**

A "scheme to defraud," like the schemes charged in the FSI, can be premised on either false and misleading statements or the concealment of material facts. But to proceed on a concealment or omission-based theory, as the FSI purports to do, the Indictment must allege a *duty* of the defendant to disclose the alleged concealed facts. Because the Indictment fails to do so here, the portions of the FSI premised on concealed facts must be dismissed.

**A.    Absent a Duty to Disclose, Securities-Fraud Charges Cannot Be Based on a Concealment or Omissions Theory of Fraud.**

In *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005), the Ninth Circuit explained that the term "scheme or artifice to defraud" under § 1344(1) incorporated the "well-settled common-law meaning of fraud and thus requires the prosecution to prove a misrepresentation or concealment of a material fact to support a conviction" (citing *Neder v. United States*, 527 U.S. 1, 22–23 (1999)). As explained above, the statutory language of § 1348(1) is nearly identical to the statutory language of § 1344(1), with the only difference being that 1348(1) applies to any covered security, while 1344(1) applies to a financial institution. Both statutes criminalize the execution or attempted execution of a "scheme or artifice to defraud." Likewise, the Title 15 securities charges also rely on the operative "scheme to defraud" language. (FSI ¶132).

But fraud charges can be premised on a concealment-of-material-facts theory *only* if the Indictment alleges the defendant had a duty to disclose that information. *See, e.g.*, *United States v. Lonich*, 2016 WL 324039, *7–8 (N.D. Cal. 2016) (dismissing portion of Indictment predicated on an omissions or concealment theory because "the indictment must allege that defendant owed a duty to disclose" the fact at issue but failed to do so) (collecting cases). Non-disclosure "can support a fraud charge only 'when there exists an independent duty that has been breached by the

- 16 -

person so charged,'" and the proper remedy for improperly charging a concealment theory of fraud is dismissal of that portion of the indictment. *Id.* at *8 (quoting *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *United States v. Ali*, 620 F.3d 1062, 1070 n.7 (9th Cir. 2010) (similar); *United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (omissions theory in 10b-5 concealment case must involve a "trust relationship" between the parties, and the failure to give a jury instruction stating as much was error); *United States v. Holmes*, 2020 WL 666563, *14 (N.D. Cal. 2020) (indictment including omissions-based fraud "must allege facts giving rise to a duty to disclose").

Finally, to the extent an indictment alleges public statements were made misleading by a person's failure to disclose information, the law is settled that such a duty to disclose is narrow. "Disclosure is required under these provisions [Rule 10b-5] *only when necessary* to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (emphasis added) (cleaned up); *see also id.* at 45 ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market."); *United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006) ("truthful statements made by [a broker] about the merits of a particular investment are not transformed into misleading 'half-truths' simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment").

### B. To the Extent the Superseding Indictment Is Premised on Omissions-Based Fraud, that Portion Must Be Dismissed.

The FSI makes clear that the government's theory of fraud is premised (primarily if not entirely) on a theory that Mr. Left concealed information from the public. (*See* FSI ¶7 ("Defendant LEFT used this deception and *concealment* to

- 17 -

manipulate the market for his own financial gain."); ¶19(e)(i) ("defendant LEFT
*concealed* the contributions of third parties, including hedge funds, in the preparation
of Citron's commentary"); ¶19(e)(ii)19(i)(ii) ("defendant LEFT concealed his
intention to trade a Targeted Security in a manner inconsistent with the content and
conclusions of Citron's commentary by covering all or the majority of the positions
he held in the Targeted Security shortly after the Citron commentary on the Targeted
Security was published"); ¶19(i)(ii) ("defendant LEFT concealed Citron's financial
relationships with hedge Funds")).

But, and fatally so, the Indictment fails to allege Mr. Left owed *any* duty to
disclose his own private trading, trading intentions, or relationships with hedge funds
to anyone, let alone the Twitter-reading public. The Indictment does not cite any SEC
law or regulation requiring any disclosures by Mr. Left. The FSI sets a dangerous
precedent concerning the government's ability to label any conduct it finds distasteful
as a criminal scheme to defraud merely by asserting a defendant failed to disclose
*some* information to the public.

For example, the government alleges that to "maintain the illusion of Citron's
independence," Mr. Left "concealed Citron's financial relationships with hedge funds
and falsely represented to law enforcement that Citron 'never' exchanged
compensation with a hedge fund or coordinated trading with a hedge fund in advance
of the issuance of its commentary."[6] (FSI ¶19(i)(ii)). The Indictment further states that

---

[6] The defense strenuously disputes that Mr. Left made any false statements to law
enforcement. The quote the government put into the FSI is taken wildly out of context,
as is made clear in the Indictment itself. The agent asked, "When you check with other
hedge funds that specialize in the industry that you are looking at, is there
compensation between the two of you?" (FSI ¶127(a)). The question focused on whether
Mr. Left paid or received money from hedge funds when he checked or vetted
certain factual matters before publishing a story. The question followed a lengthy
discussion concerning Mr. Left's collaboration with other funds to properly vet
information—to ensure that no false information was spread to the market—prior to
publication. The FSI now takes this snippet of a longer conversation to improperly
suggest that Mr. Left intentionally lied to agents by telling the agent that he never

Mr. Left concealed this information "from Citron's followers, members of the media, regulators, and law enforcement…". (*Id.* ¶114). But the FSI does not claim Mr. Left had any duty to tell the public (let alone unspecified "members of the media") that he had dealings with hedge funds—because there is none. The Indictment thus charges him with concealing information from the public and the "media" that no one had any legal right to know.

Lawyers could be charged with a scheme to defraud for failing to disclose their client list to the public; doctors could be charged for failing to disclose their patient names to the public or members of the media; and, as here, a stock trader who did not act as anyone's investment advisor could be charged with securities fraud simply because he engaged a hedge fund—Anson—to trade on his behalf in a Canadian security that he himself could not trade. This is the height of vague and arbitrary enforcement that is patently unconstitutional. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement"); *see also United States v. Miranda–Guerena*, 445 F.3d 1233, 1237 (9th Cir. 2006) ("Retroactive application of unforeseen expansions of substantive law violate[s] due process because an ordinary person is not able to conform his or her conduct to what the law requires.").

Further, and although the government has argued otherwise, *see* Dkt. 137 at 9; Hr'g Tr. 44:17–18 (Dec. 8, 2025) (arguing the defense "wished this were a false statements case, but it's not"), the FSI describes a "scheme to defraud" premised, in part, on alleged false statements and misleading representations. (*See* FSI ¶7 ("defendant LEFT made false and misleading representations and half-truths about

---

received compensation from hedge funds at all. This is *not* what he said and the context of the agent's questioning proves as much.

1   his economic incentives, conviction in Citron's analyses, and valuations of Targeted

2   Securities"); ¶¶89–91 ("Additional False and Misleading Statements"); ¶95; ¶110;

3   ¶118).

4        But nearly all the alleged false statements in the FSI are actually omissions.

5   Paragraphs 90–91, for example, allege statements about four stocks. Mr. Left is

6   alleged to have begun trading "inconsistently with his public commentary" an hour

7   *after* those statements. This is an omissions-based theory of fraud—the theory being

8   that Mr. Left should have disclosed his trading well *after* he spoke to the public. The

9   FSI, as another example, describes the use of "deceptive tweets" concerning Roku,

10  while the one statement that is alleged to be false and misleading is literally true—

11  Mr. Left had exited his Roku position and was "watching ROKU from the side." (*Id.*

12  ¶¶56–59). For Nvidia, as a final example, the FSI alleges Mr. Left shared his

13  prognostication that the stock would "see $165 before we see $120." (*Id.* ¶43). Two

14  hours later, he sold his shares. (*Id.* ¶44). This too is an omission based on the idea that

15  Mr. Left should have disclosed he might sell shares short of the long-term target price.

16  Notably, this cannot be a "false statement" because Mr. Left did *not* tell people that

17  he would hold his Nvidia shares until they reached $165.

18       To the extent the government argues (as it has before) that specific false

19  representations or material omissions are not required to allege securities fraud, that

20  is both irrelevant and incorrect.

21       *First*, it is irrelevant because the FSI here *does* allege a false-statements and

22  concealment theory; whether other indictments can be pled differently is irrelevant.

23  *See, e.g.*, *Holmes*, 2020 WL 666563, *13 (ruling that government's argument that

24  indictment "need not allege specific misrepresentations because a scheme to defraud

25  may rest on something other than false statements" "misse[d] the point" because the

26  indictment rested on a false-statements and omissions theory).

27

28

*Second*, the government's argument is incorrect. The government has previously cited *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012), which, in turn, cites to *United States v. Motz*, 652 F. Supp. 2d 284 (E.D.N.Y. 2009), for the proposition that neither false statements nor material omissions are required. But *Mahaffy* (a front-running scheme) and *Motz* (a cherry-picking scheme) concerned cases where the defendants breached a duty owed to their employers and/or clients. Neither stands for the proposition that: (a) concealment of information can be a crime absent a duty to disclose; or (b) schemes with no misstatements or omissions can be criminal absent the breach of some type of fiduciary duty. Further, while the government has also relied on the scheme-liability provisions of Rule 10b-5—subsections (a) and (c)—to argue that false and misleading statements or omissions are *not* needed, this argument is premised on *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1266–67 (9th Cir. 1979), a case where the court imposed a duty on a newspaper to disclose his intent to trade. *See* Dkt. 41 at 7–9. *Zweig*, however, was decided in 1979. The next year, the  Supreme Court decided *Chiarella v. United States*, 445 U.S. 222, 235 (1980), where the Court *rejected* the government's attempts to create a general duty to disclose, and ruled that when, as here, an "allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Id*. at 235.

*Finally*, even if *Mahaffy* and *Motz* stand for the proposition the government has said they do (they do not), those cases would contradict well-settled Ninth Circuit law that schemes to defraud based on omissions or concealment theories must plead an affirmative duty to disclose. *See, e.g.*, *Lonich*, 2016 WL 324039, *8 (collecting cases).

## CONCLUSION

For these reasons, the Court should dismiss: (1) Count One; and (2) all other counts to the extent premised on an omissions-based theory of fraud.

1    Dated: February 18, 2026                Respectfully submitted,

2                                            DYNAMIS LLP

3                                            */s/ Eric S. Rosen*
                                             Eric S. Rosen (*pro hac vice*)
4                                            Michael B. Homer (*pro hac vice*)
                                             Yusef Al-Jarani
5                                            Aaron Katz (*pro hac vice*)

6                                            *Attorneys for Defendant Andrew Left*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 22 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF COMPLIANCE**

I certify, as counsel for Defendant Andrew Left, that this memorandum of points and authorities contains 7,000 words, which complies with the word limit of L.R. 11-6.1.

Dated: February 18, 2026                    _/s/ Yusef Al-Jarani_____
                                                                Yusef Al-Jarani