**DYNAMIS LLP**

ERIC S. ROSEN (*pro hac vice*)
erosen@dynamisllp.com
MICHAEL B. HOMER (*pro hac vice*)
mhomer@dynamisllp.com
EMILY J. SCARISBRICK (*pro hac vice*)
escarisbrick@dynamisllp.com
175 Federal Street, Suite 1200
Boston, Massachusetts 02110
(617) 802-9157

YUSEF AL-JARANI (Cal. Bar No. 351575)
yaljarani@dynamisllp.com
1100 Glendon Ave., 17th Floor
Los Angeles, California 90024
(213) 283-0685

AARON KATZ (*pro hac vice*)
akatz@aaronkatzlaw.com
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305

*Attorneys for Defendant Andrew Left*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANDREW LEFT,<br><br>    Defendant. | Case No. 2:24-cr-00456-VAP<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION *IN LIMINE* TO EXCLUDE RECORDS, EMAILS, AND EVIDENCE RELATING TO HEDGE FUND A**<br><br><span style="color:red">**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL.**</span><br><br>Date:    April 27, 2026<br>Time:    10:00 a.m.<br>Ctrm:    6A<br>Judge:    Hon. Victoria A. Phillips |

## <u>NOTICE OF MOTION AND MOTION</u>

TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 27, 2026, or as soon after as the matter may be heard, in Courtroom 9C of the above-captioned Court, located at 350 West 1st Street, Los Angeles, CA 90012, Defendant Andrew Left moves for an Order excluding certain documents and e-mails related to Hedge Fund A █████

The Motion is based on this Notice of Motion and Motion, the incorporated Memorandum of Points and Authorities, and any other evidence or argument that the Court may consider at the hearing on this motion. For the reasons in the accompanying Memorandum of Points and Authorities, Mr. Left respectfully requests that the Court grant this Motion.

This Motion is made after the conference of counsel under L.R. 7-3.

Dated: March 23, 2026

Respectfully submitted,

DYNAMIS LLP

*/s/ Eric S. Rosen*
Eric S. Rosen (*pro hac vice*)
Michael B. Homer (*pro hac vice*)
Yusef Al-Jarani
Emily J. Scarisbrick (*pro hac vice*)
Aaron Katz (*pro hac vice*)

*Attorneys for Defendant Andrew Left*

# **TABLE OF CONTENTS**

INTRODUCTION AND FACTUAL OVERVIEW ................................................... 1

LEGAL STANDARD ............................................................................................ 10

ARGUMENT ....................................................................................................... 12

  I.    The Documents Are Irrelevant And Would Unfairly Prejudice And Mislead
        The Jury ........................................................................................................ 13

  II.   Many of the At-Issue Documents Are Inadmissible Hearsay ....................... 17

CONCLUSION ..................................................................................................... 22

2:24-CR-00456-VAP
DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE RECORDS AND EMAILS RE: HEDGE FUND A

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ambassador Hotel Co. v. Wei-Chuan Inv.*,
189 F.3d 1017 (9th Cir. 1999)................................................................12

*Balboa Capital Corporation v. Okoji Home Visit MHT, LLC*,
111 F.4th 536 (5th Cir. 2024)................................................................22

*Clark v. City of Los Angeles*,
650 F.2d 1033 (9th Cir.1981)..........................................................13, 20

*NLRB v. First Termite Control Co.*,
646 F.2d 424 (9th Cir. 1981)................................................................20

*Paddack v. Dave Christensen, Inc.*,
745 F.2d 1254 (9th Cir. 1984)................................................................22

*Phillips v. United States*,
356 F.2d 297 (9th Cir. 1965)................................................................15

*Sana v. Hawaiian Cruises*,
181 F.3d 1041 (9th Cir. 1999)................................................................23

*Standard Oil Co. of Cal. v. Moore*,
251 F.2d 188 (9th Cir. 1957)................................................................21

*Stoyas v. Toshiba Corporation*,
896 F.3d 933 (9th Cir. 2018)................................................................12

*U.S. v. Bonallo*,
858 F.2d 1427 (9th Cir. 1988)................................................................23

*United States v. Bonds*,
608 F.3d 495 (9th Cir. 2010)................................................................15

*United States v. Daneshvar*,
925 F.3d 766 (6th Cir. 2019)................................................................20

*United States v. Engelmann*,
720 F.3d 1005 (8th Cir. 2013)................................................................16

*United States v. Hitt*,
981 F.2d 422 (9th Cir. 1992)................................................................19

*United States v. Hussain*,
972 F.3d 1138 (9th Cir. 2020)..........................................................12, 16

- iii -

*United States v. Licavoli,*
  604 F.2d 613 (9th Cir.1979)......................................................................20

*Versata Software, Inc. v. Internet Brands, Inc.,*
  2012 WL 2595275 (E.D. Tex. July 5, 2012).......................................21

## Statutes

15 U.S.C. §78..............................................................................................11, 16

18 U.S.C. §1348 ...............................................................................1, 11, 13, 16

## Rules

Fed. R. Evid. 401 ........................................................................................11, 15

Fed. R. Evid. 402 ........................................................................................11, 15

Fed. R. Evid. 403 ........................................................................................11, 15

Fed. R. Evid. 801 ........................................................................................20, 13

Fed. R. Evid. 802 ........................................................................................12, 20

Fed. R. Evid. 803 .............................................................................12, 22, 20, 13

Fed. R. Evid. 805 ...............................................................................................23

## Other Authorities

L.R. 7-3 ................................................................................................................1

### INTRODUCTION AND FACTUAL OVERVIEW

The Government's securities fraud scheme rests on at least two fundamental flaws: 1) that Left had some duty to disclose his trades and trading intentions to his Twitter followers (he did not), and 2) that while the Government screams "fraud," it does not dispute that the vast majority of Mr. Left's allegedly fraudulent opinions about the at-issue stocks turned out to be accurate. Mr. Left was either the worst fraudster on earth, or, and more plausibly, his opinions were good-faith beliefs in what he perceived to be the value of certain, generally large-cap, stocks.

Because the Government's case revolves around telling jurors that Left's *true* statements about stocks could amount to criminal securities fraud, the Government has thrown in a hodge-podge of irrelevant, prejudicial and false evidence to bolster its case. Enter Hedge Fund A, *i.e.*, ███████████ is a Canadian hedge fund which traded two stocks on Mr. Left's behalf. *See* Ex. A ███████████ ██████  At issue here is the Canadian stock "Namaste." Namaste traded in Canada under the ticker "N," and it also was available over-the-counter in the United States under the ticker "NXTTF."

"Namaste," as the Government does not dispute, was a Canadian marijuana company committing a massive fraud on the investing public. Mr. Left's tweets, calling Namaste a "total joke" and advising to "drop it like its hot" were undoubtedly true, as were the accompanying reports which explained the fraud. Ex. B (Sept. 14, 2018 Namaste Tweet). Namaste stock is now trading as Lifeist Wellness at a value of nearly zero.[1] Mr. Left was right about Namaste and his commentary helped expose a fraud that Government regulators failed to catch, saving investors tens of millions. But rather than indict the CEO of Namaste (a serial fraudster), the Government has indicted Mr. Left for revealing Namaste's fraud to the market. This makes no sense.

---

[1] *See* Yahoo Finance (Feb 10, 2026), https://finance.yahoo.com/quote/LFST.V/ (Ex. X)

The Government's theory of fraud is perplexing because it targets Mr. Left for exposing someone else's fraud. The original Indictment described Mr. Left's work with Namaste, insinuating that it was some type of fraud on the market simply to work together with a hedge fund and share ideas. *See* ECF No. 1 ¶19 ("Indictment" or "Ind."). It is not. Nor is it a crime to be paid by a hedge fund to publish research, or even to partner with a hedge fund to execute a short campaign.

Instead, the Government's indictment takes issue with *how* Left made money from trading Namaste. In early September 2018, Left's research revealed (correctly) that Namaste was very likely committing fraud. As discovery documents have proven, Left was unable to establish a significant short position in Namaste himself because the stock traded almost exclusively in Canada and was unavailable for him to "borrow." *See* Ex. C ██████████ email between ██████████ and Left); Ex. A at ██████ So, Left accepted an offer from ██████████, a founder of the Canadian hedge fund ██████ and an old friend, to short Namaste on Left's behalf. *See* Ex. C. As part of that lawful arrangement, Left would receive profits from ██████ shorting of Namaste (if any) and he would also be responsible for all losses incurred. *Id.* In September and October 2018, Left published short reports exposing Namaste's fraud. *See* ██████ Ex. E (Sept. 12, 2018 and October 4 2018 Citron Reports on Namaste). ██████ generated a profit shorting the stock for Left and owed Left the proceeds. Ex. F ██████████████████). There was nothing wrong with this arrangement, and the Government does not allege that anything Left told the public about Namaste on Twitter or in his reports was false (it was not).

██████ however, faced a conundrum about how to send Left his trading proceeds for multiple reasons. At the same time that ██████ was shorting Namaste, it was participating in financing for the company. Ex. G ██████████████ ██████ didn't want to appear like it had paid a short-seller to drive down the stock

2:24-CR-00456-VAP
DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE RECORDS AND EMAILS RE: HEDGE FUND A

price to benefit itself in the financing. ▮▮▮ was also "long" many other cannabis stocks. Ex. F at ▮▮▮. In addition, ▮▮▮ managed a fund with outside investors. ▮▮▮ could not simply pay Left a portion of trading proceeds because that could deprive its own investors of profits. Thus, ▮▮▮ needed to make the trading proceeds appear to be a business expense for "research" to pay Left what they owed him.

To conceal these conflicts, ▮▮▮ transferred Left's trading profits to him through a third-party research company, ▮▮▮. Ex. F at ▮▮▮; Ex. ▮ ▮▮▮ ▮▮▮ Ex. H ▮▮▮. By receiving "research" invoices from a third-party, ▮▮▮ could justify the expense on their books as "research."

The initial Indictment alleged that it was Mr. Left (not ▮▮▮ who "directed [▮▮▮ to send LEFT's share of the trading profits through a third-party intermediary to conceal the true beneficiary and purpose of the payments from ▮▮▮ to LEFT," and that, *at defendant LEFT's direction*," the intermediary provided ▮▮▮ with a series of "false invoices" for "Research Services." Ind. ¶102. In effect, the original Indictment contended that Mr. Left orchestrated a scheme to cover-up his trading payments from ▮▮▮ by asking ▮▮▮ to route them through a third-party, ▮▮▮, and then have ▮▮▮ send the funds on to Left.

But, this was obviously not true. It was ▮▮▮ that had the motivation to use the false invoices; Left did not. Left did not care how he was paid. The money went to his personal bank account. *See* Ex. ▮▮▮. And, discovery and ▮▮▮ reflect that ▮▮▮



. Ex. H . As detailed below, the evidence shows that

Id.

8.

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE RECORDS AND EMAILS RE: HEDGE FUND A



In addition, Anson managed funds on behalf of investors.

2:24-CR-00456-VAP

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE RECORDS AND EMAILS RE: HEDGE FUND A



████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ In short, discovery documents proved this was ████████████ and not that of Mr. Left. The only suggestion that Mr. Left directed the scheme ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████ The DOJ failed to independently corroborate *any* of these claims before leveling securities fraud charges against Mr. Left.

The defense worked diligently to show the Government that it's allegation that Left "directed" a payment scheme were wrong. The Government now agrees with the defense that ██████████████████ about Left having directed ████████ to route payments through Falcon. Indeed, the Superseding Indictment makes clear that Left was correct. The Government abandoned its claim that the scheme was done at Left's direction. FSI ¶ 123.

Yet, the Superseding Indictment cites a number of "Research Services" invoices for companies as payment for research that never took place, as apparent evidence of some scheme involving Left. *Id*. at ¶123. Specifically, it claims that "Individual F ████████████ received payments from Hedge Fund A ████████ supported by false invoices for research services." *Id*. But as the Government well knows—and the FSI does not dispute—those invoices were sent by ████████████████. Ex. L

- 6 -

███████████████████████████████████████████. Left was not copied on those invoices and he had no knowledge of them. These invoices have no probative value as to Mr. Left's state of mind or any other issue in the case. All they show is that ██████, who the DOJ never charged, concocted a scheme to send money to ████████ so that it could improperly label Left's trading proceeds as "research."

The Superseding Indictment is correct that Mr. Left sent invoices for "consulting services" to ████████. *Id.* at ¶125. However, this occurred only because ████████ *requested* that Left send him invoices before releasing the trading proceeds to him. *See* Ex. O ███████████████████████████████████████ There are no allegations that Left defrauded anyone with those invoices or even that he lied to anyone. ████████ the individual who requested the invoices (perhaps for his own accounting), of course knew that Mr. Left did not provide consulting services. There are no allegations that the "consulting services" invoices were ever sent on to anyone else, were used by ████████ for any other purpose, or served any purpose for Left other than to facilitate the release of his lawful trading proceeds *to his own bank account*. In short, the Government's allegations are that Mr. Left and ████████ falsely categorized, *between themselves only*, trading proceeds as "consulting" so that Mr. Feshbach would release money that was properly owed to him. That is not illicit and it is certainly not securities fraud.

The Government is attempting to use this highly peripheral issue to generally smear Mr. Left. Indeed, the Government does not claim that any of these invoices were ever made public, as would be required for securities fraud committed against the public (as alleged). Rather than focusing on alleged false statements to investors (there are none), the Government seeks to distract the jury from the core issues of this case by dragging Mr. Left into ████████ scheme.

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE RECORDS AND EMAILS RE: HEDGE FUND A

Even worse, the Government seeks to rely on inadmissible, unreliable, and flimsy evidence to suggest Left was involved in � ploy to doctor its records and deceive its investors. The three ▀ witnesses who live in Canada—▀ ▀—refuse to come to the United States for trial. The one ▀ witness who lives in the United States and told the truth during his testimony ▀, has refused to say whether he will testify or plead the Fifth Amendment. The Government has indicated it will call no ▀ witnesses to either describe the alleged scheme or prove its case, even though these documents have nothing to do with Left.[2] Left is not copied on these documents. He did not see them. Although they might have had a slight relevance when the DOJ alleged that Left was the mastermind of ▀ actions, they are now *irrelevant* to the current charges. Yet the risk of prejudice to Left is high. Presenting these documents to the jury would naturally lead them to believe that Left was involved in ▀ actions—the very allegations that the Government has rightly stricken and believes are untrue. So too do these documents risk confusing the jurors and creating a "mini-trial" on completely superfluous issues.

The Government seeks to admit at trial documents related to this ▀ scheme to route Left's trading proceeds through ▀. We understand this will likely include three categories of documents:

*First,* ▀ internal documents and communications which show ▀ cooking its own books by disguising trading proceeds as "research fees." In addition, the Government has indicated that it intends to introduce ▀ trading records under the "business records" hearsay exception.

*Second,* ▀ communications with ▀, which purport to show research invoices for research never conducted that justified the payment of funds from ▀

---

[2] In recent weeks, the Government has indicated that it may call an Anson witness to authenticate documents.

2:24-CR-00456-VAP
DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE RECORDS AND EMAILS RE: HEDGE FUND A

*Third*, communications between ███████ and Left by which ███████ requests that Left send him "consulting invoices" to release money that was owed to Left and Left then sent those "invoices."

The documents are likely to include, but are not limited to, the below-listed documents as examples:[3]

- A ███████████████ email from ██████ to ███████ accounting service, copying ████████ Chief Executive Officer, stating, ██████████████████ ████████████████████████████████████████████ ████████████████ Ex. P.
- An ██████████████████████ from ████████████, Head of Finance at ████ Research, to ████████████████████████████████████████" Ex. J.
- An ████████████████ from ████████████ requesting ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████. Ex. K.
- A ████████████████ email from ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Ex. L.

---

[3] This list is not comprehensive, and the defense reserves our rights to challenge all internal ██████ documents and correspondence, all documents and correspondence between ████████████ and all documents and correspondence between Left and ████████ as well as all testimony concerning these documents, communications and events.

- A ███████ email from ███████ asking ███████ ████████████████████████████████████ ███████████████████ Ex. M.

- A ███████ email response from ███████ instructing him to ████████████████████████████████ Ex. M.

- A ███████ email from ███████████████████ ███████████. Ex. R.

- A ███████ email invoice from ███████████████████ ███████ Ex. S.

- Unauthenticated summary charts of ███████ own trading records, created by unknown individuals at ███████ *See* Ex. Z.

**LEGAL STANDARD**

There are a number of legal principles applicable to this motion *in limine*.

*First*, evidence that does not tend to make any fact of consequence more or less likely is irrelevant and inadmissible at trial. Fed. R. Evid. 401, 402. A court may exclude relevant evidence "if its probative value is substantially outweighed by a danger" of "unfair prejudice, confusing the issues, misleading the jury, wasting time" or "needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Related to this, Title 18 securities fraud applies only to securities "registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) or that [are] required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d))." 18 U.S.C. §1348(1). The Superseding Indictment does not allege that either NXTTF or N were so registered. FSI ¶15.

Further, neither Title 18 securities fraud nor Title 15 securities fraud are general fraud statutes. Rather, each statute requires alleged fraud to be "in connection with" the "purchase or sale" of "any security." 15 U.S.C. §78j(b). 18 U.S.C. §1348(1) ("in

connection with" a security covered under the statute). This standard requires the fraud "to "touch" the sale—*i.e.,* it must be done to induce the purchase at issue." *See Stoyas v. Toshiba Corporation*, 896 F.3d 933 (9th Cir. 2018)(internal citations omitted). As the Ninth Circuit has made clear, the fraud "must have more than some tangential relation to the securities transaction." *See Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999).

Courts "consider whether the plaintiff has shown some causal connection between the fraud and the securities transaction in question…". Notably, "[d]**eception related to the value or merit of the securities in question has sufficient connection to securities transactions to bring the fraud within the scope of § 10(b)**." *See Stoyas*, 896 F.3d 933 at 951 (emphasis added) (internal citations omitted). The Ninth Circuit applies the same standard "in connection with" standard to Title 18 securities fraud. *See United States v. Hussain*, 972 F.3d 1138, 1147 (9th Cir. 2020).

*Second*, hearsay—an out-of-court statement used to prove the truth of the matter—is inadmissible absent an exception. Fed. R. Evid. 802. For a memorandum or record to be admissible under the business records exception to the rule against hearsay, it must be "(1) made by a regularly conducted business activity, (2) kept in the "regular course" of that business, (3) "the regular practice of that business to make the memorandum," (4) and made by a person with knowledge or from information transmitted by a person with knowledge." *Clark v. City of Los Angeles*, 650 F.2d 1033, 1036-7 (9th Cir.1981); Fed. R. Evid. 803(6)(A)-(C). These conditions must be shown by the testimony of the custodian or "another qualified witness" or by Rule 902(11) or (12) certification. Fed. R. Evid. 803(6)(D). If an opponent shows the "method or circumstances of preparation" indicate "a lack of trustworthiness" then the evidence is not an admissible business record. Fed. R. Evid. 803(6)(D).

## ARGUMENT

The DOJ contemplates introducing the first two categories of documents— internal ██████ records and communications between ██████████████████ —for the truth of the matter asserted without any ████████ witnesses testifying at trial, under the business records exception, to "prove" that Left was paid for "research." But these ██████-created documents are not business records. They are communications that document a scheme by ████████ to doctor its own books and records to make it appear that Left was paid for research. The documents bear none of the hallmarks of reliability and trustworthiness required for a hearsay exception. Remarkably, the DOJ itself also consistently refers to a subset of these documents as "false." FSI ¶123 ("Individual F received payments from Hedge Fund A, supported by *false* invoices for research services ...."). Yet, the Government seemingly now posits that these same documents are sufficiently reliable to come under a hearsay exception. The Government cannot have it both ways. It cannot retract the very allegations that connected Left to ████████ payment scheme while introducing evidence relevant only to those allegations. And it cannot label documents "false" while also presenting them as reliable business records. The court should preclude the admission of the documents described in this motion from trial.

For the third category of documents, the communications between Left and ██████████ while conceivably admissible as statements of a party opponent under Fed. R. Evid. 801(d)(ii), they have no bearing on the charges here. The documents are unconnected to the purchase and sale of the security. Even if they were, NXTTF/N are not covered securities under Title 18 U.S.C. § 1348 and the one Title 15 securities fraud count concerning Namaste, Count Three, concerns a single statement on October 4, 2018, months *before* Left and Feshbach communicated about returning the

- 12 -

trading proceeds to him. It is unclear how communications about payment months after the allegedly false statement are relevant.

Additionally, the securities fraud scheme charged by the Government concerns the dissemination to the public of false and misleading information. There are no allegations that these communications were ever so disseminated to anyone besides ███████ who had asked Left to create the "consulting" invoices. In fact, the Indictment presents the payment of trading proceeds to Left as a wholly separate "scheme," *unrelated* to the purchase or sale of securities. *See* FSI ¶123. Put simply, this "false invoice" scheme has nothing to do with securities fraud or any connection to the purchase or sale of a security. And, there are no allegations that involve a dissemination of false information to the public. The "false invoice" scheme is irrelevant as a matter of law to the charges, and as a matter of fact to the charged scheme, which involved the dissemination of false information to the public.

In sum, the court should exclude all evidence related to the purported "false invoice" scheme from trial, including internal ███████ documents, communications between ███████, and communications between Left and ███████. These documents are irrelevant to any purported evidentiary purpose. Any minimal probative value is outweighed by the substantial risk of prejudice, confusion, and wasting time.

## I. The Documents Are Irrelevant And Would Unfairly Prejudice And Mislead The Jury

The court must exclude evidence that is of no consequence to the charges in a case. Fed. R. Evid. 401, 402. The court must also exclude evidence whose limited probative value "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, . . .[or] wasting time[.]" Fed. R. Evid. 403. None of the three categories of documents—internal ███████ documents, ███████ communications, and ███████ Left

- 13 -

communications—are probative of the Government's allegations. Any conceivable probative value is outweighed by the significant risk that the documents would lead the jury to make improper prejudicial assumptions based on the documents, confuse the issues in the case, and waste time.

*First,* ███████ internal communications and documents concerning its communications with ██████, are irrelevant. There are no allegations that Left saw the documents or communications, was copied on these communications or even knew about them. Rather, these documents show ██████ manipulating its accounting records and deceiving its own investors by turning "trading proceeds" into "research fees." That is all. Without a connection to Left, these documents simply show nothing about his state of mind nor any other conceivable issue in this case. *See United States v. Bonds,* 608 F.3d 495 (9th Cir. 2010) (*Phillips v. United States,* 356 F.2d 297, 303 (9th Cir. 1965) ("[S]o-called 'constructive' notice or knowledge of a circumstances, based upon actual knowledge of a co-conspirator…has no tendency, circumstantially or otherwise, to prove criminal intent."); *see also United States v. Engelmann,* 720 F.3d 1005, 1008 (8th Cir. 2013) ("Fraudulent intent is not presumed or assumed; it is personal and not imputed."). Without any probative value, this is the very definition of unfair prejudice.

*Second,* all three categories of documents are irrelevant to the case because none were submitted to or seen by outside investors, which is the crux of the alleged scheme. A significant portion of these documents were only ever seen internally by ██████ personnel. *See e.g.,* Ex. T ██████████████████). The Left/██████ communications were seen only by Left and ██████ months after the purchases and sales of securities took place. *See e.g.,* Ex. S ██████ ██ email between Left and ██████ Moreover, neither Left nor ██████ was deceived by their correspondence. ██████ knew that Left was not his consultant. Left knew that

he was receiving trading proceeds and accounted for the proceeds on his own tax returns accordingly. And Left was unconcerned with how ███████ wanted to account for his distribution of the funds from ██████ that was an issue between ██████ d ██████

Nor is there any connection between these documents and the "purchase or sale" of a security, as required for securities fraud. *See* 18 U.S.C. §1348(1); 15 U.S.C. §78j(b). The Indictment plainly alleges that the transfer of funds to Left was a discrete "scheme" executed months after the purchases and sales of securities. (FSI ¶123). This scheme bore no connection to the "purchase or sale" of securities and is, by definition, not securities fraud. Furthermore, there is no allegation that the allegedly fraudulent and misleading materials were disseminated to the public as required for a securities fraud involving purported false and misleading information. *See Hussain*, 972 F.3d at 1147.

The Government's stated "relevance" purpose is that the "fake invoice" scheme was undertaken to "conceal the true beneficiary and purpose of the payments from Hedge Fund A to defendant LEFT." FSI ¶123. But none of the invoices were ever made public. Left had the money sent to his own bank account in his own name. *See* Ex. I (██████ emails between Left and ███████████ ██████ Left had no one to conceal anything from because there are no allegations that he had any duty to reveal to the general investing public that he was receiving money from a hedge fund. Nor is there anything illegal about doing so. The Government has simply manufactured a scheme out of whole cloth.

*Third*, evidence related to the "fake invoices" has no relevance to any of Left's public statements and should not be admitted for this purpose. To justify the admission of this alleged payment scheme with ██████ the Government is attempting to forge a tenuous connection with another, unrelated stock, General Electric. It has

represented to the defense that the invoice scheme renders Left's statements about General Electric misleading. Nothing could be further from the truth.

Nearly a year after Left's Namaste report, Harry Markopolos released a now widely discredited short-report on General Electric. *See* Ex. U. The stock plunged on the false information. Left then tweeted in support of the company and told people that the report was untrue. *See* Ex. V and Ex. W (Aug. 16, 2019 Left Tweet about GE and Citron Report on GE). Left stated Citron had "never been compensated by a third party to publish research" and that "would not pass internal compliance nor would it pass compliance of any fund that Citron would collaborate with on ideas." Ex. W at 1. Left made this statement because Markopolos' report indicated that he had been paid by an unnamed third-party hedge fund to put out the report, and his payment was contingent on the profits made by the hedge fund on the trade. Left believed that this was unethical. The Government did not prosecute Markopolos for his false report that knocked billions off GE's market cap but it has indicted Left, who *told the truth*.

The Government's incorrectly theorizes tha the "fake invoices" documents are relevant. *First*, Government posits that these documents are admissible to prove the truth of the matter asserted—namely, to show that ▮▮▮▮ paid Left to put out research. *Second*, the Government suggests that these documents are relevant because they show Left's statements in the wake of the Markopolos report to be inaccurate. *See* FSI ¶111. But Left did not say in his statements regarding GE that he had never been compensated by hedge funds. He did not claim that he never received funds from hedge funds, or that he never "collaborat[ ] with hedge funds." *Id.* ¶112. Nor did Left advance the "false pretense that defendant Left was independent," whatever that means. *Id.* ¶111. Rather, Left's stated that Citron had never been paid by a hedge fund solely to "publish research." *See* Ex. W. The at-issue documents do not show Left being paid to "publish research"—they demonstrate only Left's receipt of trading

- 16 -

proceeds for trades made on his behalf. *See* Ex. A ███████████ These documents thus have no bearing on whether his statements about Citron's payment for research were accurate, despite the Government's allegations to the contrary.

Last, even assuming the documents have some minimal relevance and probative value they are unfairly prejudicial to Left and would mislead the jury. The court should exclude documents "if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422 (9th Cir. 1992). If the documents were admitted, jurors would assume that Left was familiar with them. This would lead to the prejudicial impression that Left wanted to conceal his payments from ██████ despite any evidence from the Government to that effect. It would also imply that Left was involved in ████ 's own attempts to obscure its trading in Namaste.

The documents would furthermore cause juror confusion by injecting a convoluted and irrelevant storyline into the case. The documents include many details: reference to four uncharged securities, the need to conceal trading in a central security in the case, Namaste, and payments for "research" that was never conducted. *See*, e.g., Ex. L, Ex. M ████████████████████ ████████████████ ). And it is the Government's goal to bring this evidence in without a single witness to contextualize the documents or a single witness to cross-examine. The parties would spend (and waste) substantial time trying to explain the meaning and import of these documents as opposed to focusing the jury's valuable time on the core issues implicated by the indictment. The court should exclude all the at-issue documents for the reasons set forth above.

## II.   Many of the At-Issue Documents Are Inadmissible Hearsay

The court should further exclude the first two categories of documents— ██████ internal documents and communications and ████████ communications with

- 17 -

Feshbach—because they are inadmissible hearsay for which no exception applies. Hearsay is an out of court statement offered for the truth of the matter asserted. Fed. R. Evid. 801. It is inadmissible absent an exception. Fed. R. Evid. 802. The Government has indicated that it intends to offer the internal ████ documents, and communications between ██████████████, for their truth, as proof that ████ compensated Left for "research." This is a misrepresentation of the documents, but regardless, the documents themselves are core inadmissible hearsay.

The Government has suggested that introduction of these documents at trial is permissible under the business records exception to the rule against hearsay. *See* Fed. R. Evid. 803(6). This is incorrect. The business records exception to the rule against hearsay exists only because true business records bear "special indicia of reliability." *NLRB v. First Termite Control Co.*, 646 F.2d 424, 427 (9th Cir. 1981). To qualify under the exception, business records must "be made in the course of and as a regular practice of a regularly conducted business activity." *See United States v. Licavoli*, 604 F.2d 613 (9th Cir.1979), Fed. R. Evid. 803(6)(B) – (C). A record must be made under "established company procedures for the systematic or routine … making and preserving of company records" and relied upon by the business in the performance of its functions. *Clark v. City of Los Angeles*, 650 F.2d 1033, 1037 (9th Cir.1981) (internal citations omitted). There are no such indicia of reliability here in either the internal ████ documents, or the ██████████ documents.

*First*, the Government cannot lay the foundation to establish that any of these informal communications are business records. An email is not a business record "simply because it was sent between two employees…or because employees regularly conduct business through email." *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Circ. 2019). "Casual and informal" communications between employees are not business records even if employees discuss business records in those communications



when they are "intended as communications between employees, and not as records of company activity." *See Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 215 (9th Circ. 1957); *see also Versata Software, Inc. v. Internet Brands, Inc.*, 2012 WL 2595275, at *1 (E.D. Tex. July 5, 2012)(finding company emails were inadmissible hearsay where emails were for "information sharing purposes" and "not a system for preparing and retaining business records as a regular and routine practice.").

The █████ internal emails and documents are informal communications between employees. They discuss how █████ will account for the proceeds of Lefts trades in its records. Ex. T ████████████████ ████████████████████ ███████. They are not "records" of company activity made under any relied-upon company procedures. These documents do not memorialize █████ final accounting of the invoices upon which the business or investors would rely. There is no indication that they are made under any standardized █████ system for determining the proper accounting mechanisms. And █████████████ █████████████████" Ex. F at ████████.

The communications between █████n and █████, including discussion regarding the false invoices, are similarly informal and unreliable; moreover, as the Government alleges, these were "*false* invoices." *See* Ex. J, Ex. K. They too fail to meet the threshold requirements of reliability for business records. █████h and █████ did not act under any business duty or duty of accuracy to █████ who was not their employer. They had no incentive to ensure the accuracy of ████ records keeping. █████ was motivated purely by the desire to █████████ ███████████████████[4]

---

[4] These reliability issues will also prevent the Government from being able to authenticate the documents at trial, and we challenge any proposed certification under Rule 902(11) or (12).

Even if the Government could establish that the documents were "a regular practice of a regularly conducted business activity"—which it cannot—all the hearsay documents are also fundamentally untrustworthy. *See* Fed. R. Evid. 803(6)(e). The Government itself states that the invoices sent from ▮▮▮ to ▮▮▮ are "false" and "fake." *See* FSI 19(i)(iii); Ind. ¶¶ 102; 103; Opp. to Mot. to Strike Surplusage at 4–5; Surplusage Hr'g Tr. at 46. The Government cannot credibly claim that the invoices, accounting records, and the emails and records related to them, are both "fake" *and* so reliable and trustworthy that they warrant an exclusion to the rule against hearsay such that they can be presented without any witness testimony.

The internal ▮▮▮ documents, as well as the communications between ▮▮▮ and ▮▮▮, are also untrustworthy because they form part of ▮▮▮ scheme to conceal its conflicts of interests. *See* ▮▮▮▮▮▮ Logically, documents created by parties engaged in "dubious activities" or fraud are inherently untrustworthy. Here, ▮▮▮ itself acknowledges that it directed the creation of the false invoices to doctor its internal records and obscure all its associations with Left, and trading in Namaste, from it investors. Ex. F at 217 ▮▮▮▮▮. *See Balboa Capital Corporation v. Okoji Home Visit MHT, LLC*, 111 F.4th 536 (5th Cir. 2024) (excluding documents as unreliable and untrustworthy under the business records exception where the record-creator was involved in a Ponzi scheme and "dubious activities."). So too are the ▮▮▮ communications untrustworthy because ▮▮▮ was admittedly acting only at the direction of ▮▮▮, and out of self-interest in furthering his own business relationship. Ex. H at 85 ▮▮▮▮ ▮▮▮.

The invoices sent from ▮▮▮▮ themselves are also untrustworthy because they were altered extensively to further ▮▮▮s deception. *See U.S. v. Bonallo*, 858 F.2d 1427 (9th Cir. 1988) (reasoning that if the government "attempted

2:24-CR-00456-VAP
DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE RECORDS AND EMAILS RE: HEDGE FUND A

to introduce into evidence what it contended to be ordinary records, made in the normal course of business, in their original form, then proof that the records had been altered would indeed tend to show that they were unreliable."). Not only was the initial invoice sent to ███ from ███ a sham (*see* Ex. H ████████ ███), but that invoice was subsequently reissued as multiple invoices at ███ behest twice. *See* Ex. K; Ex. L. The second re-issue of the invoice referenced four companies that did not appear on any previous invoice, and for whic███ n admittedly never performed research. Ex. ████████████ There is no evidence showing that Mr. Left knew any of this.

Furthermore, the content of the hearsay ███ documents ████████ documents is not admissible for its truth; it is inadmissible double hearsay not subject to any exception. *See Sana v. Hawaiian Cruises*, 181 F.3d 1041 (9th Cir. 1999) ("each layer of hearsay must satisfy an exception to the hearsay rule"); Fed. R. Evid. 805. The documents cannot be entered to prove, for example, that the ███ invoices really related to Namaste, that they somehow reflected "research" that was actually performed by Left, that they bore any connection to Left, or that ███ paid ███ invoices. Any information or statements within the documents that are offered for their truth are impermissible out of court statements that lack the indicia of reliability and trustworthiness to fall under the business records exception to the hearsay rule, or any other exception.

The court should exclude these unreliable, untrustworthy, and irrelevant documents that were created to conceal ███ conflicts of interest and have no bearing on the case as-is.

Finally, the Government has told the defense it wishes to introduce a "few internal ███ business records that are admissible to show trading that occurred." *See* Exs. Y, Z. But the records provided to the defense demonstrates that these exhibits are not

2:24-CR-00456-VAP
DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE RECORDS AND EMAILS RE: HEDGE FUND A

business records; rather, they are summary charts created by some unknown person. *See, e.g.,* Exhibit Z. This appears to be a compilation of ██████ purported profits from trading near Citron reports. Not only is this irrelevant, but this table was created and produced for this very litigation, and none of the underlying records supporting this table have been produced or are verifiable. *See* Fed. R. Evidence 1006; *Paddack v. Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984) (document prepared for litigation is not a business record).

Likewise, the Government has provided the defense with a list of trades compiled by ██████ and put into a summary chart. ████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████ *See* Ex. AA. This too is not a business record; it is a summary chart.

### CONCLUSION

For the foregoing reasons, Left respectfully requests that the Court grant this motion and exclude from trial all records and emails described in this motion, including (i) internal ██████ documents, including summary charts of trading records (ii) communications between ████████████████, (iii) and communications between Mr. Left and ████████████ pertaining to the false-invoice issue.

- 22 -

Dated: March 23, 2026

Respectfully submitted,

DYNAMIS LLP

*/s/ Eric S. Rosen*
Eric S. Rosen (*pro hac vice*)
Michael B. Homer (*pro hac vice*)
Emily J. Scarisbrick (*pro hac vice)*
Yusef Al-Jarani
Aaron Katz (*pro hac vice*)

*Attorneys for Defendant Andrew Left*

- 23 -

## <u>CERTIFICATE OF COMPLIANCE</u>

No. 2:24-cr-00456-VAP

I certify, as counsel for Defendant Andrew Left, that this memorandum of points and authorities contains 6955 words, which complies with the word limit of L.R. 11-6.1.


Dated: March 23, 2026              /s/ Yusef Al-Jarani
                                    Yusef Al-Jarani

- 24 -