**DYNAMIS LLP**

ERIC S. ROSEN (*pro hac vice*)
erosen@dynamisllp.com
MICHAEL B. HOMER (*pro hac vice*)
mhomer@dynamisllp.com
EMILY J. SCARISBRICK (*pro hac vice*)
escarisbrick@dynamisllp.com
175 Federal Street, Suite 1200
Boston, Massachusetts 02110
(617) 802-9157

YUSEF AL-JARANI (Cal. Bar No. 351575)
yaljarani@dynamisllp.com
1100 Glendon Ave., 17th Floor
Los Angeles, California 90024
(213) 283-0685

**AARON KATZ LAW LLC**

AARON KATZ (*pro hac vice*)
akatz@aaronkatzlaw.com
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305

**WEIL, GOTSHAL & MANGES LLP**

ADAM FEE (Cal. Bar No. 345075)
adamfee@weil.com
BEN NICHOLSON (Cal. Bar No. 317970)
ben.nicholson@weil.com
1999 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
(213) 667-5100

*Attorneys for Defendant Andrew Left*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANDREW LEFT,<br><br>    Defendant. | Case No. 2:24-cr-00456-VAP<br><br>**DEFENDANT ANDREW LEFT'S RULE 29 MOTION**<br><br>Date: May 22, 2026<br>Time: 8:00 a.m.<br>Ctrm: 8C<br>Judge: Hon. Virginia A. Phillips |

**Table of Contents**

INTRODUCTION ...................................................................................... 1

STANDARD OF REVIEW ......................................................................... 2

THE EVIDENCE ...................................................................................... 3

    A.  The SEC's Disclosure Requirements ......................................... 3

    B.  Mr. Left's Publications on the Stocks at Issue ......................... 3

    C.  Mr. Left's Use of "Target Prices" ............................................ 5

    D.  Mr. Left's Trading in the Stocks at Issue ................................ 6

    E.  Mr. Left's Work with Hedge Funds ......................................... 8

    F.  Mr. Left's Voluntary Public Disclosures Regarding His Trading ................. 9

    G.  The Materiality of Mr. Left's Trading Strategy, Use of "Investors," and Work with Hedge Funds ...................................................... 10

    H.  Evidence of Mr. Left's Intent ................................................. 12

THE GOVERNMENT'S BURDEN .......................................................... 13

ARGUMENT ......................................................................................... 16

    I.  The Government Did Not Prove Any Affirmatively False Statements of Fact About the Companies or Stocks at Issue. ................................. 17

    II.  The Government Did Not Prove That Mr. Left Published False Opinions. ... 17

    III.  The Government Did Not Prove That Mr. Left Made Materially False Statements About Himself or Citron Research. ................................. 19

    IV.  The Government Did Not Prove a "Half-Truth" Under *Macquarie*. .............. 20

    V.  The Government Failed to Prove That Any Omission Was Material. ............ 25

    VI.  Scalping Precedents Do Not Save the Government's Case. .......................... 28

    VII.  The Government's Theory of Fraud Violates the First Amendment. ............. 34

CONCLUSION ...................................................................................... 34

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

## **INTRODUCTION**

Andrew Left is being prosecuted for expressing his opinions about 15 stocks that traded on the NASDAQ and NYSE, many of which were among the most liquid and closely watched in the market.[1] *See* Superseding Indictment, ¶ 134 (charging that Mr. Left "executed" a securities fraud scheme "by issuing tweets and reports concerning the . . . issuers"). Some people disagreed with Mr. Left's inferences, conclusions, and predictions. But the government's own witnesses repeatedly conceded that they could not identify in the publications at issue a single false statement of fact about the stocks or the companies in question. And, although not all of Mr. Left's predictions panned out, most of his opinions turned out to be right.

In a nutshell, the government's theory of fraud is this: Mr. Left's non-disclosure of his short-term trading strategy caused objectively reasonable investors to give Mr. Left's opinions more weight than they otherwise would have—including insightful and intelligent opinions that, if heeded, would have generated those investors outsized returns on some of the world's most successful companies (*e.g.*, NVDA, FB, and TSLA) and protected them from fraudulent issuers and bubble stocks (*e.g.*, NXTTF, PTE, IGC, and CRON). If that theory of securities fraud sounds novel and strained, that is because it is. As we demonstrate below, the government's unprecedented theory cannot be reconciled with Supreme Court, Ninth Circuit, and myriad other federal precedents.

What the government presented at trial was not insider trading. It was not a "pump-and-dump." It was not a "short-and-distort." Nor was it anything like the "scalping" prosecutions that federal courts previously have endorsed. Mr. Left was not an insider of any of the companies at issue. He was not an investment advisor or

---

[1] A sixteenth stock, NXTTF, was a Canadian company whose stock traded on the Toronto Stock Exchange and was co-listed on the domestic over-the-counter market. The government also discussed four stocks not specifically included in the indictment's charging paragraph for Count One or in Counts Two through Seventeen (CHGG, FLT, MCK, and LOPE).

- 1 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

serving in any other fiduciary capacity.  He did not front-run subscribers to whom he sold a trading system.  He did not encourage his audience to buy over-the-counter penny stocks of sham companies he secretly controlled, or from which he was receiving secret compensation.  He did not engage in artificial trading—such as wash trading or marking the close—to create fake liquidity or prices.  His common stock holdings were never large enough that his own trades had a meaningful impact on volume or price.  His opinions were based on publicly known facts that no witness identified as untrue.

On the evidence the government presented, no reasonable jury could find Mr. Left guilty of securities fraud, and we are confident that our jury would issue a verdict in Mr. Left's favor here.  But this case is larger than Mr. Left.  This case raises profound First Amendment concerns, because it tests the extent to which the government can *criminalize* the expression of financial opinions in the noisy "town square" that is the internet.  The eyes of the investing world are on this case. Submitting this case to the jury would have a profound chilling effect on truthful, non-misleading speech that provides a value to the public markets and the investor community.  The only way for this Court to send a clear message that Mr. Left's conduct did not—and does not—violate the securities fraud laws is to grant his Rule 29 motion and enter a judgment of acquittal on all counts.

## STANDARD OF REVIEW

A district court "must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  For the government to survive a defendant's Rule 29 motion, the evidence adduced during the government's case-in-chief, viewed "in the light most favorable to the prosecution," must be "adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Nevils*,

- 2 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

598 F.3d 1158, 1164 (9th Cir. 2010) (*en banc*) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"More than a 'mere modicum' of evidence is required to support a verdict." *Id.* at 1164 (quoting *Jackson*, 443 U.S. at 320).  Even when construed in the government's favor, the evidence "may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt," or it "may be insufficient to establish every element of the crime."  *Id.* at 1167.  "[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a 'total failure of proof of a requisite' element." *Id.* (citation and alteration omitted) (quoting *Briceno v. Scribner*, 555 F.3d 1069, 1079 (9th Cir. 2009)).

<b><u>THE EVIDENCE</u></b>

Viewed in the light most favorable to the government, the evidence showed the following:

**A.     The SEC's Disclosure Requirements**

Mr. Left was a corporate outsider and never held a control position in any of the stocks at issue.  Thus, Mr. Left's trading never triggered any SEC disclosure requirements, such as a Form 4, Form 13D, Form 13F, or Form 13G.  The government's witnesses also conceded the absence of any specific SEC rules or regulations requiring Mr. Left to disclose his trading strategies or trades, as well as the absence of any SEC rules or regulations restricting Mr. Left from trading in close proximity to his publications.  He was not subject to any holding period requirement.

**B.     Mr. Left's Publications on the Stocks at Issue**

The internet, social media, and cable television have given rise to a vibrant, noisy marketplace of ideas in the investing world.  As retail trader John Noonan confirmed, Mr. Left was one of many voices and personalities who participated in that marketplace.  Mr. Left published bullish and bearish opinions on NASDAQ and

- 3 -

NYSE stocks.  Some of the stocks on which Mr. Left commented were stalwarts whose stocks Mr. Left said had been unfairly beaten down and were primed for a reversal (*e.g.*, FB and GE).  Some were growth companies that Mr. Left said had more potential than the market was recognizing (*e.g.*, NVDA, TSLA, NVTA, XL, and LK).  Others were well-known companies that Mr. Left said were flawed, broken, or just plain overvalued (*e.g.*, TWTR, ROKU, AAL, and PLTR).  Others were bubbles that Mr. Left said were trading mostly on euphoria and hype (*e.g.*, CRON, BYND, and NVAX).  And still others were, according to Mr. Left, complete frauds (*e.g.*, NXTTF and PTE).  Mr. Left expressed his opinions in short-form tweets on the Twitter account that he controlled, longer-form reports published on the Citron Research website, and sometimes during television appearances on CNBC or podcasts such as "Quoth the Raven."

Mr. Left's opinions were often contrarian and unpopular, which is why they provided a valuable contribution to the marketplace of ideas.  Mr. Left is not omniscient and cannot control the future, and so not all his predictions panned out.  Most of Mr. Left's opinions at issue, however, turned out to be right.  His timely bullish calls on stocks like NVDA, FB, and TSLA were spot on, while his bearish warnings about stocks like NXTTF, CRON, PTE, BYND, AAL, and NVAX ultimately turned out right as well.

The government's own witnesses—including its lead case agent, Postal Inspector Anna Hallstrom—conceded that they could not identify in any of Mr. Left's publications a single objectively false statement of fact about the companies or stocks at issue.  Inspector Hallstrom testified that the factual truth or falsity of Mr. Left's statements about the companies and stocks was not something the government even investigated. (Trial Tr. 146:14–18 (May 15, 2026).)  Inspector Hallstrom went further, testifying that "it wouldn't make sense for someone with a platform like Mr. Left to put false information in his reports."  (Trial Tr. 64:7–65:14 (May 18, 2026).)

- 4 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

Mr. Left's opinions and predictions were premised on publicly available facts that he identified in his publications.  The government's own witnesses repeatedly confirmed the accuracy of those objective facts.  For example, although he "did not agree" with the subjective conclusions that Mr. Left reached, Grand Canyon Education CFO Dan Bachus agreed that Citron Research's reports on Grand Canyon's stock ("LOPE") appeared to rely on "accurate numbers derived from LOPE's public filings"; that it was "true" that LOPE's revenues were "almost entirely from [its subsidiary] Grand Canyon University"; that it was "true" that the company's CEO was also the president of Grand Canyon University; and that LOPE's public response to the Department of Education was "accurate[ly] transcribed by Citron."  (Trial Tr. 76:4–12, 99:21–101:2, 110:2–7 (May 20, 2026).)  Citron's "captive subsidiary" thesis pre-dated by two months a 16-page letter from the U.S. Department of Education reaching the same conclusion.  (*Id.* at 89:12–18, 94:11–21.)

### C.     Mr. Left's Use of "Target Prices"

Similar to how investment bank sell-side analysts issue price targets for stocks they cover, Mr. Left sometimes listed "target prices" for the stocks he discussed. Mr. Left generally did not specify the time frames that applied to his "target prices," but multiple witnesses testified that reasonable investors understand that a "target price" generally means the price at which the stock may trade in 12 to 18 months.  Of the stocks at issue in the indictment, Mr. Left announced some form of "target price" for NVDA, FB, and XL on the long side; and for CRON, NXTTF, PTE, TWTR, NVAX, AAL, PLTR, and BYND on the short side.  In addition, Mr. Left stated that he "expect[ed]" NVTA to "trade to $100 in the next 24 months."  The government did not introduce any evidence that Mr. Left's "target prices" were unreasonable. Indeed, most of the stocks hit the target prices.

JP Morgan tech-stock analyst Doug Anmuth conceded that target prices are "opinions," "predictions," and "not guarantees," and that "different analysts, different

- 5 -

people can come up with different price targets." (Trial Tr. 131:23–132:7 (May 13, 2026).)

### D.     Mr. Left's Trading in the Stocks at Issue

Mr. Left actively traded the stocks on which he opined. The government's trading expert and summary witness Ross Waller testified that Mr. Left typically would build a position in advance of issuing his public commentary—with the position size peaking very shortly before publication—and then reduce (or sometimes completely exit) the position after issuing that commentary. If Mr. Left planned to issue bullish commentary, he would build up a long position through some combination of call options and common stock. He would then sell those call options and common stock shortly after issuing his commentary. If Mr. Left planned to issue bearish commentary, he would build up a short position through some combination of put options and common stock. He would then sell those put options or buy-to-cover common stock shortly after issuing his commentary. Mr. Waller concluded that this trading was consistent with Mr. Left taking short-term trading profits if the market moved in the direction of his publication. (*See* Trial Tr. 31:3–10 (May 19, 2026).) Mr. Waller agreed that what the government calls "trading opposite" is merely the execution of a trade to realize profits from an earlier trade. (*Id.* 138:9–24.) He testified that such profit-taking is reasonable for someone with a short-term trading strategy, calling it "just trading" and "managing a position." (*Id.* 163:2–19, 167:5–6.)

Mr. Waller presented a summary chart regarding how much of a "pre-tweet" or "pre-report" position Mr. Left exited or closed out within two days following the publication. For most of the stocks, Mr. Waller's summary chart showed that Mr. Left closed out at least 50% of his position on the day of publication and at least 90% of the position by the second day of the publication. Mr. Waller conceded, however, that Mr. Left sometimes would *re-establish* the position from which he had exited. For example, Mr. Waller's summary chart showed that, although Mr. Left completely

- 6 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

exited his long NVDA position on November 20, 2018, he then re-built a 20,000-share long position in NVDA the very next day. (GX 1006.) Mr. Waller's charts also showed that, even where Mr. Left aggressively reduced an over-sized position on the day of publication, the position that Mr. Left continued to hold was still extremely large. For example, Mr. Left's peak position in FB on December 26, 2018 was the equivalent of 370,000 shares—the equivalent of a $50 million leveraged position that, at the time, was multiple times larger than Mr. Left's total account balance. By the end of the day, Mr. Left had whittled that position down to the equivalent of 40,000 shares—a nearly 90% reduction from Mr. Left's peak position size, but still equivalent to a $6 million long position in the stock, which was an extremely large percentage of Mr. Left's account balance and thus entirely consistent with the bullish opinion that Mr. Left had expressed. (GX 1008.)

Mr. Waller's summary chart showed that, for two of the stocks he analyzed—NVTA (long position) and MCK (short position)—Mr. Left held at least 50% of his pre-publication position beyond the second day following the publication. (GX 1024.) Mr. Waller also acknowledged on cross examination that, in some instances (*e.g.*, BYND and FLT), the market moved *against* Mr. Left's position immediately or very shortly after he published his commentary, such that Mr. Left's post-publication trades were merely loss-limiting trades. (*See, e.g.*, Trial Tr. 20:19–25:8 (May 20, 2026).)

Mr. Waller repeatedly conceded that he had no opinion that Mr. Left's trading strategy was unreasonable, unlawful, or improper. Pressed on whether reducing a position in advance of an uncertain macroeconomic catalyst was "reasonable," Mr. Waller answered: "everybody has their own reasons to trade" and he "can't call them unreasonable." (Trial Tr. 149:19–150:3 (May 19, 2026).) Indeed, Mr. Waller acknowledged that, "the answer I would give to any of these is it reasonable questions is gonna be yes," and that even reducing a long position in advance of an earnings

- 7 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

announcement was something for which "of course there's a trader for whom that would be reasonable." (*Id.* at 158:12–23.)

### E.     Mr. Left's Work with Hedge Funds

Mr. Left at times shared his ideas with and made trade recommendations to hedge funds that valued his opinions.  Mr. Left had a contractual sub-advisory agreement with the SEC-registered hedge fund Atom Investors under which Mr. Left would receive compensation if Atom Investors acted on Mr. Left's trade recommendations and those recommendations turned out to be profitable.  The agreement did not provide that Mr. Left would be compensated for publishing reports regarding positions Atom Investors already held, nor did it provide Mr. Left control of Atom Investors' funds.  Among other recommendations, Mr. Left recommended to Atom Investors that it take long positions in GE and LK after those stocks had been attacked by short sellers Harry Markopolis and Muddy Waters, respectively.  He also recommended to Atom Investors that it take a short position in PLTR based on an overvaluation thesis.  (*See* GX 817.)  These recommendations to Atom Investors aligned with what Mr. Left had published on his Twitter feed and the Citron Research website.  During the period he was managing trades for Atom Investors, Mr. Left referred to Citron as having "investors" on a podcast and in a couple investor letters.

Mr. Left also briefly worked with the Canadian hedge fund Anson to put on a trade for him in the Canadian-listed shares of Namaste and IGC.  Because those stocks only traded over the counter in the United States, Mr. Left had difficulty borrowing shares to short the stocks.  (Trial Tr. 153:9–154:9 (May 18, 2026).)  Anson agreed to short the stocks for Mr. Left.  (*Id.* at 120:24–121:2.)  If the trade was profitable, Anson and Mr. Left would share the proceeds.  (*Id.* at 121:14–19.).  Anson was trading on behalf of a third party, Mr. Left, in its investors' funds.  (*Id.* at 78:8–24.)  Anson paid Mr. Left through an intermediary—Falcon Research—using false invoices.  (70:12–72:5.)  Mr. Left was confused about how to structure the invoices so he could receive

- 8 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

his share of the trading proceeds. (*Id.* at 81:13–21.) There is no evidence that Mr. Left sought to conceal his relationship with Anson. (*Id.* at 73:22–74:7, 77:14–17.) Inspector Hallstrom testified that the proceeds from the trade Anson put on for Mr. Left was not compensation for publishing research. (*Id.* at 84:18–24.)

Mr. Anmuth conceded that, like Mr. Left, the analyst reports that he issued under JP Morgan's name did not disclose to readers the substance of his pre-publication conversations with hedge-fund clients that inform his research. (Trial Tr. 130:9–13, 185:19–24 (May 13, 2026).) As Mr. Anmuth put it: "There'd be no reason to" disclose such information, because it is not "relevant." (*Id.*)

### F.    Mr. Left's Voluntary Public Disclosures Regarding His Trading

Mr. Waller and Mr. Anmuth, among others, agreed that market participants generally do not disclose their trades and trading strategies. Mr. Waller testified that, while he was at Bridgewater, he and his colleagues were "paranoid about other market participants figuring out what [Bridgewater] might be doing in the market." (Trial Tr. 131:18–20 (May 19, 2026).) Mr. Anmuth testified that, although his analyst reports disclose whether JP Morgan *has* a position in the security at issue, the reports do not disclose the *size* of JP Morgan's position, JP Morgan's own trading or trading strategy in those securities, or the extent of JP Morgan's financial relationship with the issuer. (*Id.* at 170:3–175:8, 188:17–22.)

Mr. Left's disclosures were not dissimilar. While Mr. Left did not publicly disclose his precise trades, he did disclose that Citron Research typically held positions in the securities it discussed and could change those positions at any time for any reasons. The Citron Research website, which was publicly available to everyone and also accessible through Mr. Left's Twitter profile, included a prominent disclaimer stating this. (GX 815.) Citron Research updated its disclaimer to make it even more robust in 2019, years prior to learning about the government's investigation. (Trial Tr. 159:20–161:24 (May 20, 2026).) Moreover, at least one of

- 9 -

Mr. Left's reports—his October 23, 2018 report issuing a bullish opinion on TSLA—expressly disclosed that Citron Research "trade[s] on publishing stories."  (GX 5A.)

At times, Mr. Left's publications expressly specified whether Citron was long or short the stock at issue.  For example, Mr. Left's at-issue tweets regarding TSLA, NVDA, FB, LK, GE, XL, and NVTA expressly stated that Citron held a long position or had bought shares.  And his at-issue tweets, short reports, or television statements regarding CRON, NXTTF, PTE, and PLTR expressly stated that Citron held a short position.  Those publications did not, however, specific the position size or make any promises or representations about how long Citron would hold its position.  Several of the publications at issue did not expressly state one way or another whether Citron held a position in the stock at issue (AAL, FLT, NVAX, ROKU, and TWTR).  With respect to ROKU, Mr. Left issued a second tweet stating that Citron was watching ROKU "from the side," which was accurate at the time the tweet was issued (because Mr. Left had exited his ROKU short position earlier that day).

In an August 30, 2018 appearance on CNBC during which Mr. Left's bearish report on CRON was discussed, the host asked Mr. Left whether he was "just as short" the stock at the end of the trading day as he was "at the start of the day."  Mr. Left responded that he had covered a "small" amount of that short position but was still "extremely short."  (GX 29A.)  During the course of the trading day, Mr. Left had increased his short position but took that additional exposure off prior to the close. (GX 1002.)

**G.     The Materiality of Mr. Left's Trading Strategy, Use of "Investors," and Work with Hedge Funds**

The government failed to introduce any evidence demonstrating a substantial likelihood that Mr. Left's disclosure of his trading strategy would have impacted the investment decisions of objectively reasonable investors.  At trial, the government called three retail traders—Adam Gray, Billy Banks, and John Noonan.  Only Mr. Noonan bore any resemblance to an objectively reasonable trader.  Mr. Gray and

- 10 -

Mr. Banks were more aptly described as gamblers who traded in over-the-counter penny stocks that Mr. Left accurately called out as pump-and-dumps. Neither Mr. Gray, Mr. Banks, nor Mr. Noonan ever traded in reliance on Mr. Left's publications. Thus, by definition, Mr. Left's alleged non-disclosures could not have been material to their trading decisions. Mr. Gray did not trade in any of the stocks at issue in the indictment. For CVSI, which is not a stock referenced in the indictment, Mr. Gray "disagreed" with Mr. Left's short report and chose to buy the stock anyway. (Trial Tr. 85:2–19 (May 14, 2026).) Mr. Banks owned shares of NXTTF prior to Mr. Left's comments on the stock, and he admitted that he decided to hold his NXTTF shares—and, indeed, to buy *more*—after he read Mr. Left's short report. (*Id.* at 119:20–122:24, 123:13–124:2, 128:24–129:6.) Mr. Noonan similarly testified that none of his trades in ROKU was made in reliance on any of Mr. Left's bearish tweets about ROKU on January 8, 2019. (Trial Tr. 171:14–172:4 (May 20, 2026).) Mr. Noonan acknowledged that he repeatedly day-traded ROKU before and after Mr. Left's bearish tweets on ROKU. (*Id.* at 180:16–19.) Mr. Noonan also testified that he always assumes that anyone tweeting or speaking about a stock is essentially "talking their book." (Rough Trial Tr. at 14:15–15:3 (May 21, 2026).) In sum, the only investor evidence that the government introduced directly *refuted* any suggestion of materiality.

Mr. Waller confirmed he did "not have any testimony on whether [Mr. Left's] Tweets were effective or not." (Trial Tr. at 156:13–14 (May 19, 2026)). Mr. Waller's summary charts demonstrated that sometimes a stock's price went up after Mr. Left issued bearish commentary or went down after Mr. Left issued bullish commentary. The government's causation expert Dr. Matthew Cain opined that Mr. Left's publications *or* trading sometimes "influenced" stock prices and sometimes "contributed" to the price movement already underway in a stock. Dr. Cain acknowledged that his methodology did not enable him to conclude *how much* Mr.

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

Left's publications influenced price, *how long* their price impact persisted, *which* investors they influenced, *what* information in the publications was influential, or *whether* the publications would have had less influence had Mr. Left expressly disclosed his day trading strategy to his audience.  Dr. Cain also stated on cross-examination that it may have been Mr. Left's *trades*—and not his *publications*—that had an effect on stock price.

Dr. Cain's testimony aside, the price charts themselves showed that in many instances prices continued on their pre-publication trajectory, seemingly uninfluenced by Mr. Left's commentary.  TSLA, NVDA, and FB were already climbing when Mr. Left expressed his bullish opinions about them; they continued to climb afterward.  (GX 1005; GX 1006; GX 1008.)  Conversely, TWTR, ROKU, and AAL were already falling in price when Mr. Left tweeted about them; they continued falling afterward.  (GX 1007; GX 1009; GX 1015.)  Other times, prices moved in the "*opposite* direction" of the sentiment Mr. Left expressed in his commentary.  (Trial Tr. 188:11–15 (May 18, 2026).)  For example, within minutes of Mr. Left expressing a bearish opinion of PTE, the price shot up ~10%.  (GX 1004.)  Similar, Mr. Left posted a bearish tweet about Novavax; within minutes, "the market moved against him."  (DX 2598 at 3; Trial Tr. 146:7–148:7 (May 19, 2026).)

## H.    Evidence of Mr. Left's Intent

A reasonable jury could find Mr. Left's intended to profit on his publications, but the government failed to introduce evidence sufficient to prove beyond a reasonable doubt that Mr. Left acted with the intent to defraud—*i.e.*, to deprive any victim of money or property by means of false or fraudulent pretenses, representations, or promises.  To the contrary, the government's own witnesses confirmed Mr. Left's consistent candor: with the government, with his own readers, and with the professionals he consulted in preparing his publications.

- 12 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

Mike Leznick, Mr. Left's long-time collaborator, testified that when the FBI first approached him roughly four years ago, the first thing Mr. Left told him was: "tell the truth and give them everything that they asked for." (Trial Tr. 150:21–152:2 (May 20, 2026).)  Mr. Leznick also described an editorial process at Citron that bore none of the hallmarks of fraud.  He testified that Citron Research reports took weeks—and sometimes months—to complete; that Mr. Left "frequently" requested edits "to ensure that the reports were accurate"; and that Mr. Left would refuse to publish a report until even a typo was fixed. (*Id.* at 153:16–154:21.)  Mr. Left also shared drafts before publication with professional traders, professional analysts, and lawyers for review, and did not "hide the fact other people were helping with his reports." (*Id.* at 156:25–157:18.)   Inspector Hallstrom admitted she could not "point out any intentional false statements" Mr. Left made and did not "know of any intentional false information" in his tweets or reports. (Trial Tr. 64:16–17, 65:12–14 (May 18, 2026).)

Mr. Leznick also confirmed that Citron's website and reports carried an express disclaimer telling readers that Citron and its related persons—which the investing world obviously knew included Mr. Left—"may continue to transact in covered issuer securities for [an] indefinite period" after publication, that those positions "may be long, short, or neutral at any time hereafter," and that "neither Citron Research nor Citron Capital will update any report or information to reflect changes in positions that may be held." (GX 23A at 20.)  As Mr. Bachus agreed, those words conveyed exactly what they said: that "even after the report goes out, the Citron folks will continue to trade [and] will not update the report when they buy or sell." (Trial Tr. 115:1–116:9 (May 20, 2026).)

## **THE GOVERNMENT'S BURDEN**

To be convicted of fraud, the defendant's alleged "misrepresentation must relate to fact and cannot be based on an expression of opinion or a prediction." *Bulgo v. Munoz*, 853 F.2d 710, 716 (9th Cir. 1988).  If a person expresses an objectively

- 13 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

false opinion that he does not honestly hold, or an opinion that implies facts that the defendant knows to be false, the person's opinion is treated as conveying a misrepresentation of fact. *See Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1095 (1991) ("A statement of belief may be open to objection . . . solely as a misstatement of the psychological fact of the speaker's belief in what he says."). For a statement of opinion to be actionable as securities fraud, the government must prove both subjective *and* objective falsity. *See, e.g.*, *Lane v. Page*, 581 F. Supp. 2d 1094, 1127 (D.N.M. 2008) ("A statement of false belief in something that is true might be objectionable, but it is not actionable . . . . Only when an opinion is both objectively and subjectively false is it actionable [under the securities laws].").

The federal securities fraud statutes do not "create an affirmative duty disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Indeed, if the federal securities statutes were construed to compel speech of outsiders without fiduciary duties (like Mr. Left), they likely would violate the First Amendment's prohibitions on compelled speech. *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) (holding that rules compelling speech are subject to strict scrutiny). "Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). "[J]ust because a reasonable investor would very much like to know [a] fact does not create any obligation to speak up." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Meyers Squibb Co.*, 28 F.4th 343, 353 (2d Cir. 2022) (internal quotation marks omitted); *see also TSC Industries Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976) (rejecting the argument that an omitted fact is "material" if it was a "fact which a reasonable shareholder might consider important," because such an "unnecessarily low" standard for materiality "may cause" speakers to "bury" listeners "in an

- 14 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

avalanche of trivial information—a result that is hardly conducive to informed decisionmaking").

Accordingly, to be entitled to have its case submitted to the jury, the government was required to introduce evidence sufficient for a rational jury to find beyond a reasonable doubt that Mr. Left, acting with the intent to defraud, knowingly published false statements or misleading half-truths that were material to a reasonable investor. In a securities fraud case, "the standard of materiality is judged from the perspective of a 'reasonable investor,' and is therefore an objective one." *United States v. Reyes*, 577 F.3d 1069, 1075 (9th Cir. 2009). "The sophisticated stockbroker and the uninitiated rube will both be judged by the same standard, *i.e.*, the 'reasonable investor' standard." *Harner v. Prudential Sec.*, 785 F. Supp. 626, 634 (E.D. Mich. 1992).

"Materiality depends on the significance that a reasonable investor would assign to the withheld or misrepresented information." *Reyes*, 577 F.3d at 1075 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). "The materiality of the [alleged] misrepresentation or [the alleged] omission depends upon whether there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale & Dep't Store Union v. Hewlett Packard*, 845 F.3d 1268, 1274 (9th Cir. 2017) (internal quotation marks omitted). Moreover, where the government's theory is that the defendant failed to disclose information necessary to make his affirmative statement not misleading (*i.e.*, published a half-truth), the government's burden is not to show that the defendant's *affirmative statement* was material, but rather that the *omitted information* in and of itself would have been material to an objectively reasonable investor. *See, e.g.*, *In re Apple Computer Sec. Lit.*, 886 F.2d 1109, 1116 (9th Cir. 1989) (holding that a stock's "[d]ramatic price movements in response to an

- 15 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

optimistic statement" is not evidence that the information *omitted* from that optimistic statement was material).

## **ARGUMENT**

At trial, the government barely mentioned most of the stocks on which the Superseding Indictment's individual counts are based. Indeed, for at least 8 of the stocks at issue—PTE, BYND, NVTA, LK, NVAX, AAL, PLTR, and XL—the only evidence the government introduced was that Mr. Left published an opinion about the stock without disclosing his short-term trading strategy, the stock price then moved in some fashion (as stock prices do), and post-publication Mr. Left reduced or exited the position he had built prior to the publication (which, as Mr. Waller testified, is "just trading"). The Court should summarily issue a judgment of acquittal on the counts corresponding to those stocks—Counts 4, 10, 11, 13, 14, 15, 16, and 17—based on a total failure of proof.

The rest of the counts fare no better. At least five evidentiary deficiencies are fatal to each and every charge against Mr. Left: (1) the government essentially abandoned (and certainly did not prove) the theory that Mr. Left's publications contained any false statements of fact regarding the companies or stocks at issue; (2) the government essentially abandoned (and certainly did not prove) an assertion that Mr. Left published "false opinions"; (3) the government did not prove that Mr. Left's publications included false statements about himself or Citron Research, or that any inaccuracies in those regards were material to a reasonable investor; (4) the government did not prove that Mr. Left's non-disclosure of the specifics of his position sizes or his short-term trading strategy rendered his publications' affirmative statements "half-truths" under the Supreme Court's decision in *Macquarie Infrastructure Corp. v. Moab Partners*, 601 U.S. 257 (2024); and (5) the government did not prove that the position size and trading strategy information that Mr. Left did

- 16 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

not disclose was material to a reasonable investor.  The government cannot rescue its deficient case by asserting that Mr. Left's conduct constituted "scalping."

**I.      The Government Did Not Prove Any Affirmatively False Statements of Fact About the Companies or Stocks at Issue.**

Most, if not all, of Mr. Left's publications were mixed statements of opinion (*e.g.*, that ROKU was "uninvestible" ) and fact (*e.g.*, that Apple had signed a deal with Samsung) about the companies and stocks at issue.  With respect to those factual statements, the government did not come close to showing that any of them were false.  To the contrary, the government either did not address that issue, or its own witnesses confirmed that Mr. Left's factual statements were true.

The closest that any witness came to disproving the accuracy of Mr. Left's factual statements about the companies or stocks at issue was Dan Bachus, the CFO of Grand Canyon Education, who testified about Mr. Left's short reports on LOPE (which is not charged in any of the individual counts).  But even Mr. Bachus did not come very close at all in that regard.  Mr. Bachus essentially conceded that his only disagreement was Mr. Left comparing Grand Canyon's use of its subsidiary to shift revenue and expenses to Enron's use of subsidiaries to do the same thing.

**II.     The Government Did Not Prove That Mr. Left Published False Opinions.**

Measured by any reasonable investment time horizon, nearly all of Mr. Left's opinions at issue (bullish and bearish) turned out to be spot on—many of them spectacularly so.  Against that backdrop, no rational jury could find that Mr. Left's opinions at issue were not honestly held, let alone that the opinions were objectively false.  As the Supreme Court stated in *Virginia Bankshares*, "it would be rare to find a case with evidence solely of disbelief or undisclosed motivation without further proof that the statement was defective as to its subject matter."  501 U.S. at 1096.  That is why the law requires the government to prove beyond a reasonable doubt not merely that the speaker did not subjectively believe the opinion at the time he made it, but also that the opinion turned out to be objectively wrong.  *See, e.g.*, *Page*, 581

- 17 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

F. Supp. 2d at 1127 ("Only when an opinion is both objectively and subjectively false is it actionable [under the securities laws].").

Although some of Mr. Left's predictions did not pan out, federal courts have made clear that this is not a sufficient basis to find either subjective or objective falsity. In *Brown v. Credit Suisse First Boston LLC*, 431 F.3d 36, 52–53 (1st Cir. 2005), the First Circuit held that stock "forecasts[] cannot be found to be false—objectively or subjectively—simply because they turn out to be inaccurate. To ground an inference of objective falsity, the facts must suggest that a particular rating was not plausibly premised on, or was inconsistent with, the information available to the analyst at that time. To hold otherwise would run an unacceptable risk of subjecting conscientious analysis to liability if, after the fact, external events or corporate mismanagement adversely impacted a stock that was a legitimate 'buy' when it was rated."

The government cannot get to the jury on a "false opinions" theory based merely on the evidence that Mr. Left engaged in short-term trading to take profits on his positions before his "target prices" were reached. As both the government's lay (Mr. Noonan) and expert (Mr. Waller) witnesses made clear, one can have a medium- or long-term view on a company or its stock and yet, to manage positions and manage risk, employ a short-term trading strategy that protects quick profits and minimizes overnight risk. Mr. Noonan maintained a positive long-term view of ROKU while trading in and out of stock price momentum, and closing his position to manage overnight risk. (Rough Trial Tr. 6:5–25 (May 20, 2026).) In Mr. Waller's words: "[T]he answer I would give to any of these 'is it reasonable' questions is going to be yes." (Trial Tr. 158:12–23 (May 19, 2026).) Accordingly, if Mr. Left's trading records proved merely that he engaged in trades that would be reasonable for a short-term trader to make, those trades are not a sufficient basis for the jury to find that he did not believe in the opinions he expressed, all of which took longer-term views of

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

the companies and stocks at issue. *See Brown*, 431 F.3d at 51 (holding that a statement of opinion can be proven subjectively false where the evidence of inconsistency is "stark" and "unambiguous," such as when an analyst states an opinion privately that completely contradicts an opinion he issued publicly around the same time).

Judge Pollacks's decision in *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 373 (S.D.N.Y. 2003), is instructive. In that case, the securities fraud theory was that sell-side analysts at Merrill Lynch did not honestly believe their publicly issued reports because they had "motivation to attract investment banking business" from the companies they covered. Judge Pollack held that, evidence of undisclosed "motives to issue the [positive] reports" was insufficient to demonstrate that the analysts' opinions were subjectively false. *Id.* "[U]ndisclosed motivations," Judge Pollack held, "are not actionable." *Id.* at 372. Here, the government's "trading opposite" theory is a sibling of the "motives" theory that Judge Pollack squarely rejected in *Merrill Lynch*. The government's trading evidence showed merely that Mr. Left may have had a personal financial motivation to publish an opinion that aligned with his pre-publication position in the stock. That is no different from the argument that the Merrill Lynch analysts had a personal financial motivation to speak glowingly about the companies they covered. If the latter is insufficient to demonstrate that the published opinion was not honestly held (even on a civil standard), then the former must be insufficient too.

## III.  The Government Did Not Prove That Mr. Left Made Materially False Statements About Himself or Citron Research.

One of the government's themes at trial was that Mr. Left made false statements about himself and Citron Research. The government attempted to prove that Mr. Left's response to Harry Markopolis's short report on GE—a report that Mr. Left believed was wrong and irresponsible—falsely asserted that Citron Research never took compensation from a hedge fund in return for publishing research. The

- 19 -

government also attempted to prove that Mr. Left lied when he published "investor letters" that made it appear as though Citron Research had "investors."

There are two fatal flaws with the government's assertions. First, neither Mr. Left's response to the Markopolis GE short report nor the investor letters were actually false. The government introduced evidence that Mr. Left provided recommendations to a hedge fund (Atom Investors) and that another hedge fund (Anson) placed trades in NXTTF on Mr. Left's behalf, but neither of those things is remotely the same as a hedge fund paying Mr. Left to publish a report. Moreover, as Eliza Goldberg, the Chief Legal Officer of Atom Investors made clear, Citron Research was an outside portfolio manager to Atom, which provided Mr. Left a good-faith basis to assert that Citron had investors (namely, Atom Investors). Second, even *assuming* that Mr. Left's statements about his relationships with hedge funds and Citron's investor base were literally untrue, the government did not introduce a shred of evidence that those misstatements would have been material to a reasonable investor. To the contrary, Inspector Hallstrom admitted she was not aware of a single investor who was misled by Mr. Left's use of the term "investors." (Trial Tr. 90:6–10 (May 18, 2026).) She also conceded there was no evidence the invoices to and from Falcon Research were ever made public, or that anyone other than Mr. Left or Mr. Feshbach saw them. (*Id.* at 72:6–19.)

## IV.   The Government Did Not Prove a "Half-Truth" Under *Macquarie*.

In *Macquarie*, the Supreme Court made clear that Section 10(b) does "not create an affirmative duty to disclose any and all material information." 601 U.S. 264. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Id.* at 265 (internal quotation marks omitted). The Supreme Court drew a clear line between an actionable "half-truth" and an inactionable omission. To be an actionable half-truth, the "failure to disclose information" must "render . . . 'statements made' misleading." *Id.* The Supreme Court provided guidance as to how a court should distinguish

- 20 -

between a half-truth and a pure omission. "A pure omission," the Supreme Court explained, "occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Id.* at 263. "Half-truths, on the other hand, are 'representations that state the truth only so far as it goes, while omitting critical qualifying information.'" *Id.* "In other words, the difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert." *Id.* at 264.

Whether an omission renders a speaker's affirmative statements misleading is determined by an objective "reasonable investor" standard. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). And, where the speaker's affirmative statements were ones of opinion, the law places an additional burden on the government: the government must "identify particular material facts regarding the basis for the issuer's opinion, the omission of which make[s] the [speaker's affirmative] statement 'misleading to a reasonable person reading the statement fairly and in context.'" *In re SVB Fin. Grp. Sec. Litig.*, 2025 U.S. Dist. LEXIS 113602, at *30 (N.D. Cal. June 13, 2025). "To be actionable under the securities laws," the alleged omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Put another way, the government must "tie the [alleged] omissions . . . to affirmative statements in a way that clearly demonstrates how each omission makes a given affirmative statement misleading." *River Canyon Total Return Bond Fund v. Credit Suisse*, 2024 U.S. Dist. LEXIS 219772, at *17–18 (Sept. 17, 2024) (Wu, J.).

Here, the government's half-truth theory was that Mr. Left's publications did not reveal that he would engage in short-term trading around his publications, taking short-term profits if the price of the stock moved in the direction of his published opinion. This half-truth theory fails to satisfy *Macquarie*, because the non-disclosed

- 21 -

information does not bear a sufficiently close connection to Mr. Left's affirmative statements.

The Court should first consider the government's half-truth theory with respect to the publications that did not reveal one way or the other whether Mr. Left had a position in the stock on which he was opining.[2]  Consider Mr. Left's affirmative statements regarding AAL, for example.  Regarding AAL, Mr. Left tweeted: "AAL back to $10[.] Robinhood traders have zero idea what they [are] buying."  Mr. Left did not mention one way or another whether he held a position, let alone when or how he would trade out of that position.  At the time of the tweet, AAL was nearing the peak of a retail-driven, meme-stock rally during which the stock had gone from under $10 to almost $20 in a week.  Perhaps a  consumer of Mr. Left's tweet would have liked to know Mr. Left's position in and exact trading strategy for AAL, deeming it to be relevant to assessing Mr. Left's potential bias.  That, however, is not sufficient to sustain a half-truth theory under *Macquarie*.  If it were, this would render the line between an omission and a half-truth completely illusory, as there is no limit to the type of information that may go to a speaker's bias.  If a speaker had to disclose every item of information that might be material to the issue of bias, speakers would be compelled to provide laundry lists of disclosures, lest they be exposed to a risk of criminal prosecution or a civil securities fraud suit.  That would not be good for markets, and the more likely outcome would be chilling speech, not better disclosures.

The government's half-truth theory fares no better under *Macquarie* with respect to the publications where Mr. Left disclosed that he had a position.  Take the government's fraud allegations regarding NVDA, for example.  On November 20, 2018, NVDA was trading ~7% lower than it had closed the prior day.  This was after the stock's price already had been beaten down substantially based on bearish

---

[2] The publications that fit into this category are his tweets about AAL, FLT, NVAX, ROKU, and TWTR.

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

sentiment coming out of its Q3 2018 earnings report. Its pre-market plunge had all the hallmarks of a capitulation low, setting the stock up for a high probability of a strong upside retracement (*i.e.*, a bounce). Mr. Left's bullish tweet shortly after the opening bell included the factually true statement "Citron buys NVDA," along with a prediction that the stock was more likely to hit $165 (a $20 upside move) than $120 (a $25 downside move). No objectively reasonable investor would have construed the statement "Citron buys NVDA" as an implied representation that Mr. Left would hold NVDA for any particular period of time, or would only sell once it hit a particular price. Instead, as Mr. Noonan testified, an objectively reasonable investor would assume *nothing* about Mr. Left's trading strategy, both because trading strategies of non-fiduciary outsiders like Mr. Left are inherently individualized and unrestricted, and because the market is a constantly flowing stream of information to which professional traders must react in real time.

The Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Construction Industries*, 575 U.S. 175 (2015), is instructive. In that case, the Supreme Court addressed whether the company violated the securities laws by stating in a registration statement that it believed it was in compliance with federal and state healthcare laws, without disclosing that it had not conducted a robust investigation to confirm that belief. The company later got swept up in a Department of Justice investigation for anti-kickback statute violations, which precipitated a lawsuit by investors who had bought the stock based on the registration statement. In assessing whether the company's registration statement constituted a half-truth, the Supreme Court held that, in determining whether "an omission renders misleading" the speaker's affirmative statement, a court must take the perspective of a reasonable investor who "takes into account the customs and practices of the relevant industry." *Id.* at 190. The Supreme Court explained that an omission should not be "viewed in a vacuum," but must be "considered, as is appropriate, in a broader frame." *Id.*

- 23 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

Here, the broader frame was best provided by John Noonan, who agreed that he was fully aware that traders do not disclose their trading strategies as a matter of custom and have no obligation to do so as a matter of law. Mr. Noonan also agreed that disclosing one's trading strategy in advance would not make much sense, because markets change so rapidly (literally minute by minute) that a trader's plans will be constantly changing based on the message the market is giving. (Rough Trial Tr. 4:18–21, 15:21–16:2 (May 21, 2026).) Mr. Noonan's expectation is not idiosyncratic; it reflects basic market economics about front-running. Had Mr. Left been required to announce, contemporaneously with each bullish report, that he intended to take profits (sell) shortly after, the market would have raced to sell ahead of him. Had he been required to announce his intent to cover a short, investors would have bought ahead of him to capture the upside, subjecting Mr. Left to a "short squeeze" that the government's own expert conceded is a "catastrophic event for someone who's very short." (Trial Tr. 143:15–144:4 (May 19, 2026).) No reasonable investor expects— or wants—that result, and requiring it would destroy the incentive to publish value-additive market commentary at all. Against that backdrop, an objectively reasonable investor would not consider a statement such as "Citron buys NVDA" or "we are long $TSLA for this quarter" to imply a particular holding period. A reasonable investor who placed any weight on Mr. Left's opinions also would have known what Mr. Left plainly disclosed in his TSLA report, which is that Citron in fact "trade[s] on publishing stories." (GX 5A.)

Also on point is the Second Circuit's decision in *United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006) (holding that, because "no SEC rule [specifically] require[d]" the defendant "to disclose to [his customers his] own compensation, whether pegged to a particular trade or otherwise," a failure to disclose that information could not be deemed a fraudulent half-truth). In that case, the question was whether the defendant, a stockbroker who was not acting as a fiduciary, had a

- 24 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

duty under Section 10(b) to disclose to his customers that he was receiving enhanced commissions for recommending particular stocks. The district court's instructions implied that the defendant did have such a duty. The Second Circuit disagreed, holding that "a seller or middleman may be liable for fraud if he lies to the purchaser or tells him misleading half-truths, but not if he simply fails to disclose information that he is under no obligation to reveal. Because a registered representative is under no inherent duty to reveal his compensation, otherwise truthful statements made by him about the merits of a particular investment are not transformed into misleading 'half-truths' simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment." *Id.* The government's half-truth theories with respect to Mr. Left cannot be reconciled with *Skelly*. A rule that Mr. Left is duty-bound to inform his readers that he will be taking profits from the market if the price of a stock moves in the direction of his publication would be functionally analogous to a rule that a non-fiduciary broker is duty-bound to inform his customers of his commissions. The Second Circuit rejected the latter in *Skelly*, and this Court should reject the former here.

## V.    The Government Failed to Prove That Any Omission Was Material.

Even *assuming* that the government's half-truth theory satisfies *Macquarie* (which it does not), it still falters on the element of materiality. With few exceptions, Mr. Left's publications pertained to highly liquid stocks of well-known companies that were covered by investment bank analysts and talked about constantly in the "Twitter-verse." Under the Ninth Circuit's decision in *Apple Computers*, the government's burden on the materiality element was not to show that Mr. Left's *affirmative statements* were material, but rather that the *omissions* were material. The government totally failed to prove that. *See also In re Alphabet Sec. Litig.*, 1 F.4th at 699–700 (holding that a "misleading omission is material if there is a substantial likelihood that [the omitted information] would have been viewed by the reasonable

- 25 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

investor as having significantly altered the 'total mix' of information" relevant to the stock).

Most notably, all three retail investors that the government called to the witness stand—Mr. Gray, Mr. Banks, and Mr. Noonan—testified that they did not rely on Mr. Left's publications in deciding to buy, sell, or hold their stocks. Indeed, all three testified that they purchased the stocks on which Mr. Left had recently issued bearish opinions—the equivalent of a person who sees a flashing "Don't Walk" signal but decides to cross the street anyway. The government's half-truths theory necessarily implies that, if Mr. Left had disclosed that he was going to be engaged in short-term trading of the stocks he discussed, those three investors would have given even *less weight* to Mr. Left's opinions. That clearly cannot satisfy materiality. *Cf. United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010) ("At trial, every former client who testified said that he or she would not have bought the house stocks had he or she known about the bonus commissions.").

To satisfy the element of materiality, the government therefore is left only with speculation and Dr. Cain (a hired gun who speculated in exchange for compensation). Neither is sufficient. As Dr. Cain conceded, his analysis (which lacked a sound methodology to begin with) did not seek to measure whether a stock's price reaction to Mr. Left's publications would have been different had Mr. Left expressly disclosed that he would engage in short-term trading around his opinions, taking profits at the earliest available opportunity post-publication if the stock's price moved in his direction. (Rough Trial Tr. 122:6–18 (May 21, 2026).) For example, even *assuming* that Mr. Left's bullish call on FB on December 26, 2018 was material to an objectively reasonable investor's decision to purchase shares of FB, neither Dr. Cain nor any other government witness presented any evidence about whether it also would have been material to an objectively reasonable investor to know specifically that Mr. Left took out a massively leveraged position in FB that he planned to whittle down to a "mere"

- 26 -

$6 million position by day's end.  Dr. Cain also conceded on cross examination that it may have been Mr. Left's *trades*—not his *publications*—that caused the price changes in the stocks Dr. Cain analyzed.  If it was Mr. Left's pre-publication *trades* that influenced prices, and not his *tweets or reports*, then by definition the *omissions* from those tweets and reports cannot be deemed material.

The government tried to fill the gaping hole in Dr. Cain's testimony by having Dr. Cain testify generically that "skin in the game" is relevant to an investor's perception of the credibility of a non-insider's commentary on a stock.  Dr. Cain is not a legal expert, and his testimony about *investors* does not speak to the "objectively reasonable investor" standard.  The question here is not whether *some* investor who panic-sold (or panic-bought) when Mr. Left issued a tweet would not have done so if Mr. Left had fully disclosed his short-term trading strategy.  *See, e.g.*, *United States v. Gramins*, 939 F.3d 429, 448 (2d Cir. 2019) (holding that the beliefs of an "idiosyncratic" investor are "irrelevant to materiality under the objective, 'reasonable investor' standard").  The question here is whether an *objectively reasonable investor* would have considered Mr. Left's trading strategy to be a significant consideration in light of the "total mix" of information available.  Based on the evidence presented at trial, no rational juror could answer that question in the affirmative beyond a reasonable doubt.  They, like Dr. Cain and the prosecutors, would simply be speculating.

Moreover, Dr. Cain's "skin in the game" analysis does not start from any coherent premise about what information *Macquarie* required Mr. Left to disclose. To provide an objectively reasonable investor a non-misleading portrait of his "skin in the game," did Mr. Left merely have to disclose that he *had* a position in the stocks at issue (which, of course, he still did even after he aggressively trimmed his position)? Did he have to disclose the *exact size* of his position? Whether the position was common stock, options, or both?  Whether his options were in the money or out

of the money (and, if out of the money, how far out of the money)?  The expiration dates of the options?  The size of his position relative to his total account balance? The size of his account relative to his overall net worth?  Because the government's half-truth theory has no limiting principle, Dr. Cain's entire "skin in the game" analysis completely elides these questions.

Dr. Cain's analysis also just swept past any analysis of what *other* information was part of the "total mix" of information for each of the stocks at issue at the times of Mr. Left's tweet.  This is significant because Mr. Left was trading in highly volatile stocks.  Dr. Cain's analysis only controlled for market- and industry-wide variables, but volatile stocks by definition exhibit idiosyncratic price movements that deviate from broader market and sector trends.  Insofar as the government did not present any evidence of what information comprised each *stock's* "total mix" of information at the relevant times (*e.g.*, TSLA's announcement that it was moving up earnings), how could a jury determine that Mr. Left's trading strategy would have "significantly altered" that "total mix"?  That question virtually answers itself.

## VI.  <u>Scalping Precedents Do Not Save the Government's Case.</u>

The evidence, when viewed in the light most favorable to the government, showed that Mr. Left built up positions shortly prior to the publications at issue. Inspector Hallstrom called this the "first step" in the "scheme."  Inspector Hallstrom admitted that neither this "step," nor any other "step," was "in and of itself . . . problematic."  (Trial Tr. 2:7–24 (May 18, 2026).)  But a theme that has subtly undergirded the government's prosecution of Mr. Left is that it was somehow unfair for Mr. Left to trade profitably on nonpublic information that only he and a few others possessed—namely, information about what stocks Citron Research would be publicly commenting on, what the comments would say, and when those comments would be published.  In *Dirks v. SEC*, 463 U.S. 646, 656 (1983), however, the Supreme Court squarely rejected the notion that "the antifraud provisions require

- 28 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

equal information among all traders." *Dirks* forecloses any argument that an intent to profit from information not generally known to the market equates to an intent to defraud. This explains why the government has tried to shoehorn this case into the rubric of scalping.

In *SEC v. Sripetch*, the court defined scalping as the "practice of promoting a stock without disclosing a present or immediate intent to sell the stock . . . , and it violates the antifraud provisions of the securities law." 2024 U.S. Dist. LEXIS 237299, at *5 (S.D. Cal. Apr. 16, 2024). That, however, is an overbroad characterization of federal courts' scalping precedents. We are not aware of any federal precedent holding that a non-fiduciary violates Section 10(b)'s general anti-fraud provision if, without disclosing his entire trading strategy, he (1) publishes an opinion about a NASDAQ- or NYSE-listed company whose publicly traded float he does not control and from which he is not receiving compensation, and (2) reduces or sells his own position for a quick profit in the event the stock's price moves in his direction. If this Court were to construe Section 10(b) in such sweeping fashion, it essentially would be creating a split with the Second Circuit's decision in *Skelly*.

Section 17(b) of the Securities Act of 1933 specifically prohibits one specific form of scalping—promoting a stock in exchange for "consideration received or to be received . . . *from an issuer, underwriter, or dealer*" without "fully disclosing . . . such consideration and the amount thereof." 15 U.S.C. § 77q(b) (emphasis added); *see SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1105 (C.D. Ill. 2001) (holding that Section 17(b) is "designed to protect the public from publications that purport to give an unbiased opinion but which opinions are in reality being *paid for*" (internal quotation marks omitted)). The government does not contend that Mr. Left or Citron ever received consideration *from an issuer* in exchange for a publication, and so Section 17(b) provides no help to the government here.

- 29 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

To be sure, federal courts have affirmed civil and criminal scalping prosecutions brought under Section 10(b) of the Securities Act, the Act's general anti-fraud provision. *See* 15 U.S.C. 77j(b). But in each of those cases, the defendant's conduct included at least three distinguishing features that do not exist here:

- First, the defendant engaged in a lengthy, coordinated "promotional campaign [ ] that recommended the purchase of certain stocks." *Sripetch*, 2024 U.S. Dist. LEXIS 237299, at *16. The recommendation typically was sent through a direct communication (*e.g.*, email alerts or a mailer) that the defendant proactively sent to his unwitting subscribers. *See, e.g.*, *SEC v. Beck*, 2024 U.S. Dist. LEXIS 71410, at *5 (C.D. Cal. Mar. 26, 2024) (involving "alerts" that the defendant sent to subscribers to his "TeamBillionaire" service).

- Second, the unlawful campaign promoted illiquid microcap issuers trading on the over-the-counter ("OTC") market, rather than liquid stocks trading on the NASDAQ or NYSE. *See, e.g.*, *SEC v. GPL Ventures LLC*, 2022 U.S. Dist. LEXIS 9056, at *7 (S.D.N.Y. Jan. 18, 2022); *United States v. Schena*, 2022 U.S. Dist. LEXIS 131030, at *65 (N.D. Cal. July 23, 2022) (involving the promotion of the over-the-counter stock of Arrayit Corporation).

- Third, there was no objectively plausible basis for the defendant to recommend an investment in the stock. Thus, the only reason for the defendant's recommendation was the reason that the defendant failed to disclose, which is that the defendant was seeking to create exit liquidity that otherwise would not exist, so that the defendant could unload his shares on to his subscribers for a profit. *See SEC v. Gallagher*, 2023 U.S. Dist. LEXIS 171663, at *4–5, *10–11 (S.D.N.Y. Sept. 26, 2023) (discussing the defendant's promotion of AFOM and SPOM, which traded on the over-the-counter markets).

- 30 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

In *SEC v. Beck*, for example, the defendant promoted "stocks of issuers trading in 'OTC markets' at stock prices less than one dollar." 2024 U.S. Dist. LEXIS 71410, at *5 (C.D. Cal. Mar. 26, 2024). The defendant "promote[d] the recommended stocks for periods ranging from one day to six weeks" to his "TeamBillionaire" subscribers, who had signed up with the defendant's service specifically to receive stock recommendations. *Id.* at *3. Unbeknownst to those subscribers, the defendant's "alerts" exclusively recommended the purchase of thinly traded, over-the-counter stocks that the defendant already owned. *Id.* The defendant's "alerts" created the buying liquidity that the defendant needed to unload at a profit the shares he had acquired prior to his alert, and his unsuspecting subscribers were left holding the bag. Similarly, in *SEC v. Blavin*, the defendant's "newsletter recommended purchase of the stock of Velvet Exploration, Ltd., a Canadian company engaged in mineral and gas production" with less than $400,000 in "annual income." 760 F.2d 706, 709 (6th Cir. 1985). In the three months leading up to the newsletter, the defendant "had purchased approximately 25% of the publicly available shares of Velvet stock," which his newsletter "failed to disclose . . . ." *Id.* The Sixth Circuit held that it was a "material misstatement" for the defendant's newsletter to disclose that "the investment advisor 'may' trade in recommended securities for its own account" when, in fact, the defendant held a massive portion of the company's shares, which he would be able to unload for a profit only if his newsletter whipped up a buying frenzy. *Id.*

The facts were similar in *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979). In *Zweig*, the defendant was a newspaper columnist who served as an "informal financial adviser" to his readers. *Id.* at 1269. In exchange for compensation from American Systems, Inc. ("ASI"), and in coordination with ASI's chief executives, the defendant published an article touting ASI's stock, which had a "'thin float'" of only "500,000 shares outstanding." *Id.* at 1265. The article gave "glowing praise" to ASI and recommending its stock as "a worthy investment despite its risks." *Id.* at 1265–

- 31 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

66.   The Ninth Circuit held that the defendant's speech was misleading because it "failed to reveal to investor-readers . . . that [the defendant] had purchased the [company's] stock at a bargain price knowing that he would write his column and then sell on the rise . . . .   He did not reveal that his column would also appear as a paid advertising for [the company] . . . ." *Id.* at 1266–67.   Importantly, although the defendant's specific financial circumstances triggered his duty to disclose, the Ninth Circuit held that "[c]olumnists . . . ordinarily have no duty to disclose facts about their personal financial affairs." *Id.* at 1268.

Here, the government failed to prove that Mr. Left's conduct looked anything like the scalping schemes that federal courts have deemed unlawful.   <u>First</u>, it is undisputed that, with the sole exception of NXTFF—a Canada Stock Exchange listing that Mr. Left correctly identified as a giant fraud—the stocks at issue in this case were well-known, highly liquid, analyst-covered stocks that traded on the NASDAQ or the NYSE.   The Citron publications did not create rushes of liquidity that otherwise would not have existed.   At most, the government's evidence showed the publications caused brief increases in trading volume and modest, short-lived changes in price.   As a matter of law, such circumstances cannot sustain a scalping conviction.   <u>Second</u>, none of the Citron publications actually promoted or touted any stock.   The Citron publications conveyed bullish or bearish opinions on the stocks, but that is distinct from the kind of boiler-room, explicit trading recommendations that are present in every reported judicial decision affirming a scalping conviction or judgment.   <u>Third</u>, all of Mr. Left's bullish and bearish opinions had an objectively reasonable basis, and the government does not say otherwise.   That Mr. Left had an objectively reasonable basis for all of his opinions is confirmed by the fact that most of his opinions turned out to be right.   That too differentiates Mr. Left's speech from the conduct underlying every scalping prosecution that a federal court has affirmed, all of which involve

- 32 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

bullish pumping of companies with essentially non-existent businesses and no intrinsic value.

Even if the Court believes that Section 10(b) of the Securities Act can be used to punish non-fiduciary scalping of stocks trading on the NASDAQ and NYSE, the Court should hold that the government still must prove that the defendant engaged in the promotion of ordinarily illiquid stocks for which there was no objectively reasonable investment thesis. That is the type of promotional conduct that creates the dangers against which federal courts' scalping precedents seek to guard—unwitting retail investors being sucked into artificial liquidity by promoters with undisclosed financial conflicts of interest. Limiting scalping to such factual contexts would be necessary to avoid a constitutional fair-notice violation. *See United States v. Miranda-Guerena*, 445 F.3d 1233, 1237 (9th Cir. 2006) ("Retroactive application of unforeseen expansions of substantive law violate[s] due process because an ordinary person is not able to conform his or her conduct to what the law requires.").

No rational jury could find such facts here. The kind of conduct in which Mr. Left engaged—flagging great companies that the market was undervaluing, and warning about companies that are just plain frauds—is exactly the type of conduct that the Supreme Court in *Dirks* said should be rewarded. *See Dirks*, 463 U.S. at 658. In *Dirks*, the Supreme Court held that it "could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market," if analysts who discovered material information through their own investigation were not allowed to profit from that information. *Id.* The consequences of the rule that the government is seeking to create here (through prosecution, rather than legislation or rulemaking) would be similarly inhibiting to important market commentators such as Mr. Left. If the price of speaking is either abstaining from trading or disclosing his entire trading strategy to the public, someone like Mr. Left more likely will decide not to speak at all.

- 33 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

## VII.    The Government's Theory of Fraud Violates the First Amendment.

At bottom, the government's fraud theory is that Mr. Left—a non-fiduciary who was not affiliated with any issuer—had a duty to publicly disclose his short-term trading strategy, if he wanted to express his opinions about stocks that many others in the marketplace already were talking about.  To describe the government's theory is to describe a violation of the First Amendment.  *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) (holding that rules compelling speech are subject to strict scrutiny).

## CONCLUSION

The outcome of the government's misguided prosecution of Andrew Left should not be left in the hands of a jury.  This case presents serious First Amendment concerns, and allowing a lay juror to determine whether Mr. Left's speech was criminal risks chilling speech that is valuable to the investment community and protected by the First Amendment.  Even if the jury were to come back with a verdict of not guilty (which we think it would), that would do little to calm the fears of other speakers who do not wish to suffer the same fate as Mr. Left (being indicted and forced to stand trial).  The only way for the Court to send a message that the law does not criminalize the type of speech in which Mr. Left engaged, regardless of whether the speaker also is a trader, is to enter a judgment of acquittal.

- 34 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION

Dated: May 21, 2026

Respectfully submitted,

DYNAMIS LLP

*/s/ Eric S. Rosen*
Eric S. Rosen (*pro hac vice*)
Michael B. Homer (*pro hac vice*)
Yusef Al-Jarani
Emily J. Scarisbrick (*pro hac vice*)

AARON KATZ LAW LLC
Aaron Katz (*pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
Adam Fee
Ben Nicholson

*Attorneys for Defendant Andrew Left*

- 35 -

DEFENDANT ANDREW LEFT'S RULE 29 MOTION